UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JEFFREY ALLEN,  Individually and          )
on behalf of other similarly situated     )
employees of the Chicago Police           )      **Case No. 10 C 3183**
Department,                               )
                                          )      **Magistrate Judge Sidney I. Schenkier**
            Plaintiffs,                   )
                                          )
v.                                        )
                                          )
CITY OF CHICAGO,                          )
                                          )
            Defendant.                    )

## MEMORANDUM OPINION AND ORDER[1]

Jeffrey Allen, a Chicago police sergeant, has filed this suit on behalf of himself and a putative class of employees of the Chicago Police Department ("CPD") (collectively, "plaintiffs") against the City of Chicago, alleging that the City willfully violated the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. ("FLSA"), by failing to pay plaintiffs overtime compensation for work they performed on their BlackBerry devices[2] outside their normal working hours (doc. # 25: Compl. at ¶ 2).[3] Plaintiffs contend that CPD required them "to be on-call twenty-four (24) hours, seven (7) days a week so that they could access work related e-mails, voicemails, and text message work orders regardless of their location," and that "[p]laintiff[s] received numerous phone calls, e-mails and work orders while off the clock and w[ere] not

---

[1]On December 21, 2010, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1(b), this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 35, 38).

[2] The parties agree that plaintiffs assert claims regarding work allegedly performed while off-duty "only on Chicago Police Department-issued devices, including and limited to BlackBerry devices or similar mobile communications devices, "push to talk" communication devices, and/or Department-issued laptops" (doc. # 112: Parties' Stipulation, at ¶ 2).

[3]"Compl." refers to plaintiff's first amended complaint, which plaintiff was granted leave to file on October 5, 2010 (doc. # 24).

compensated for the time spent receiving and responding to these communications" (*Id.* at ¶ 17).

Plaintiffs seek "unpaid overtime compensation, liquidated damages, costs, attorneys' fees, declaratory and/or injunctive relief" (*Id.* at ¶ 1).

Section 216(b) of the FLSA authorizes employees to bring a "collective action" against their employer to recover unpaid overtime compensation for themselves and on behalf of "other employees similarly situated." 29 U.S.C. § 216(b). Courts in this district follow a two-stage inquiry to determine whether potential class members are "similarly situated." *Nehmelman v. Penn Nat'l Gaming, Inc.*, 822 F. Supp. 2d 745, 750 (N.D. Ill. 2011). At the first stage, during which courts employ a "lenient interpretation" of the term "similarly situated," we granted Mr. Allen's motion for conditional certification of the following opt-in class under the FLSA:

> A Sworn Member at or below the rank of Lieutenant who has been employed by the Chicago Police Department in the Bureau of Organized Crime, and who has been in possession of a Department issued BlackBerry Device and who has worked a minimum of 171 hours, including uncompensated off duty hours, over a twenty-eight (28) day pay period at least once during the past three years; and has used a Department issued BlackBerry for work purposes while off-duty during at least one of the aforementioned pay periods.

*Allen v. City of Chicago*, No. 10-3183, 2013 WL 146389, at *1 (N.D. Ill. Jan. 14, 2013).

A notice of lawsuit and consent form were mailed to potential class members on February 27, 2013, and recipients were given until April 15, 2013 to opt-in to this lawsuit (doc. # 94).[4] At the completion of discovery on January 31, 2014, after we dismissed the opt-in plaintiffs who

---

[4]As we explained in our opinion on plaintiff's motion for conditional certification, "[u]nlike a class action brought pursuant to Federal Rule of Civil Procedure 23, under the FLSA, 'plaintiffs who wish to be included in a collective action must affirmatively opt-in to the suit by filing a written consent with the court. . . .'" *Allen*, 2013 WL 146389, at *2-3 (quoting *Alvarez v. City of Chicago*, 605 F.3d 445, 448 (7th Cir. 2010) (citing 29 U.S.C. § 216(b)).

failed to respond to the City's production requests for want of prosecution, Mr. Allen plus fifty-two individual opt-in plaintiffs remained in the case (doc. # 115: 2/11/2014 Min. Entry).[5]

We are now at the second stage of the collective action inquiry, as defendant has moved to decertify the conditional class (doc. # 127: Def.'s Mot. to Decertify). At this stage, we reevaluate the conditional certification in a more stringent inquiry to determine whether there is sufficient similarity between the named and opt-in plaintiffs to allow the matter to proceed to trial on a collective basis. *Allen*, 2013 WL 146389, at *3 (citing *Camilotes v. Resurrection Health Care Corp.*, No. 10 C 366, 2012 WL 4754743, at *5 (N.D. Ill. Oct. 4, 2012); *Madden v. Corinthian Colls., Inc.*, No. 08 C 6623, 2009 WL 4757269, at *2 (N.D. Ill. Dec.8, 2009)). For the following reasons, the Court denies defendant's motion.

## I.

The parties attach twenty-two deposition transcripts (seventeen of which come from opt-in plaintiffs, including Mr. Allen) along with other exhibits in support of their arguments for and against decertification of this action. The following background has been gleaned from the parties' submissions.

The Bureau of Organized Crime ("BOC") is composed of four divisions: Gang Enforcement, Gang Investigations, Narcotics, and Vice and Asset Forfeiture. The opt-in plaintiffs (including Mr. Allen) consist of seventeen from Narcotics, ten from Gang Investigations, sixteen from Gang Enforcement, seven from Vice and Asset Forfeiture, one from

---

[5]Plaintiffs attached the opt-in forms of seventy-five plaintiffs on December 6, 2013 (doc. # 107), and defendant filed a motion to dismiss twenty-three of these plaintiffs for want of prosecution (doc. # 108), which we granted (doc. # 115). While this left fifty-two opt-in plaintiffs plus Mr. Allen, the parties' October 3, 2014, submission listing the different BOC divisions in which each opt-in plaintiff worked omitted one of these fifty-two opt-in plaintiffs, Dennis O'Connor (doc. # 144: Chart of Opt-In Plaintiffs). We trust the parties will clarify this omission at the next status hearing.

both Gang Investigations and Gang Enforcement, and one from both Narcotics and Gang Investigations (doc. # 144: Chart of Opt-In Plaintiffs).

CPD has issued two general orders regarding off-duty use of CPD-issued electronic communication devices. General Order 98-08-09, issued on October 13, 2010, states, in relevant part, that department members "are not obligated or required to access, respond to electronic communications, and/or carry the devices on their person while off-duty," and "[m]embers accessing their Department e-mail account, responding to electronic messages, or using a Department-issued electronic communication device related to Department business will not be compensated unless the member is officially on a 'call-back' assignment[6] . . . or the member is directed by their superior to immediately perform a substantial task with overtime authorization from the superior directing the request" (Def.'s Ex. E).[7] The October 2010 order was modified slightly on August 7, 2013, in General Order G09-01-05. The 2013 order emphasized that "[o]ff-duty members will not use a Department-issued electronic communication device to . . . perform other work related to Department business" unless on a call-back assignment or directed and authorized to do so by a supervisor (Def.'s Ex. F).

That said, the deposed opt-in plaintiffs testified that they all believed these orders were "guidelines" rather than direct orders. In addition, BOC Chief Nicholas Roti testified that sometimes general orders can be disregarded for "good reasons" (Def.'s Ex. A: Roti Dep. at 166). Nevertheless, on October 30, 2013, Chief Roti issued a memorandum reiterating that BOC

---

[6]The City attached a copy of the July 2007 through June 2012 collective bargaining agreement ("CBA") between the City and the sergeants' union to their response to plaintiffs' previous motion to conditionally certify the class (doc. # 79: Def.'s Resp. to Mot. for Cond'l Cert., Ex. B). The CBA defined a "call back" as "an official assignment of work . . . which does not continuously precede or continuously follow a Sergeant's worked hours" (*Id.* at § 20.4). The CBA further stated that "Sergeants who are called back or who are required to report to any location for work on a regular day off shall be compensated for two (2) hours at the appropriate overtime rate or for the actual time worked, whichever is greater, at the overtime rate" (*Id.*).

[7]We refer to the exhibits attached to defendant's motion to decertify as "Def.'s Ex. _."

4

officers with BlackBerrys must follow the 2013 General Order. The memorandum stated that "All non-supervisory members of the Bureau of Organized Crime are reminded they are not required to reply to non-emergency, work related phone calls, e-mails or text messages while they are off duty unless they are receiving compensation. Upon receiving notification of an emergency situation which necessitates the member acting in their official capacity, and being compensated, the member will reply to phone calls, e-mails and text messages until they have been released from the assignment" (Def.'s Ex. G).

Each plaintiff received a BlackBerry when he or she began working at BOC. By 2013, upon receipt of the BlackBerry, officers also had to sign an agreement that they would not be compensated for work performed on their BlackBerrys while off duty, unless they were (1) on an official "call back" assignment, as defined in the CBAs; or (2) directed by their supervisor "to immediately perform a substantial task with overtime authorization from the superior directing the request" (Def.'s Ex. D: Sample Compliance Form). Plaintiffs also received "push-to-talk" devices and laptops from the CPD, but they rarely, if ever, used these while off-duty.

Despite these General Orders and agreements, every deposed plaintiff testified that he or she was required to keep the BlackBerry turned on and physically close by while off-duty, although a few deponents silenced their email notifications (but *not* telephone) during their sleep hours (doc. # 133: Pls.' Resp. to Def.'s Mot. to Decertify at 10). Every deposed plaintiff testified that he or she feels obligated to respond to all work phone calls received off-duty on their BlackBerry and to review and respond to certain emails they receive while they are off-duty. Plaintiffs feel obligated to review and respond to emails sent directly to them from their supervisors or subordinates, many of which require an immediate response, and the majority of the deposed plaintiffs also feel obligated to review Crime Prevention and Information Center

("CPIC") emails – mass emails reporting shootings in the Chicago area – to determine if the shootings related to one of their ongoing cases.

None of the deposed plaintiffs has ever been formally disciplined for not being responsive to their BlackBerry while off-duty, although one plaintiff testified that she had been verbally reprimanded by her supervisor for not being responsive (Def.'s Ex. C: Dep. of Maureen Laurich at 75-76). The other plaintiffs testified that they always responded to the calls and emails they received on their BlackBerrys while off-duty, and thus there was no cause for any discipline. All of the deposed opt-in plaintiffs stated that they would be unable to do their job effectively without responding to their BlackBerrys during off-duty hours.

Some deponents testified that they spent, on average, fifteen to forty-five minutes off-duty on their BlackBerrys each day, while other deponents testified that they spent on average one to two hours daily doing off-duty work on their BlackBerrys. Chief Roti agreed that officers were obligated to respond to phone calls received off-duty, but he testified that they were not obligated to review or respond to emails off-duty (Roti Dep. at 89-93, 125, 152, 159, 163). None of the plaintiffs deposed kept track of how much time they worked on their BlackBerrys while off-duty.

To receive overtime compensation, the General Orders state that CPD officers are to seek "pre-approval" from – or at least to inform – their supervisors of their intent to work overtime. Then, after the overtime is worked, they are to submit a "time due slip" requesting overtime pay for the time worked (doc. # 132: Def.'s Mem. in Supp. of Mot. to Decertify at 3-4). Only one of the deposed opt-in plaintiffs ever submitted a request for, and received, overtime compensation for off-duty work performed on his BlackBerry. Lt. Nathan Hamilton testified that he submitted a "time due slip" occasionally for off-duty work he performed on his BlackBerry, when he spent

6

more than two hours consecutively working on his BlackBerry, sending or receiving email (Def.'s Ex. O: Hamilton Dep. at 47, 50-51).[8]  Chief Roti testified that plaintiffs should only submit time due slips if they have done a "substantial" amount of work on their BlackBerry (Roti Dep. at 150, 178, 193). Chief Roti opined that a half-hour's worth of work on the BlackBerry would be substantial (*Id*. at 146-48).

None of the other deposed opt-in plaintiffs ever submitted a time due slip for off-duty work performed on their BlackBerry devices (or other department-issued electronic devices). They were never expressly encouraged to or discouraged from submitting time due slips for off-duty work they performed on their BlackBerrys.[9]  However, plaintiffs testified that they understood from experience and longstanding expectations that no one ever submitted time due slips for this work, and so it would be frowned upon if they sought overtime compensation for this work.  The plaintiffs all said they believed that reviewing and/or responding to their BlackBerry while off-duty and without compensation was simply part of the job in the elite, coveted BOC positions.

## II.

Plaintiffs argue that the aforementioned facts satisfy the more stringent showing of similarly situated required in the second stage of the FLSA collective action analysis.  At this second stage, plaintiffs "must demonstrate similarity beyond simply claiming that the FLSA has been violated; an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws must be present." *Russell v. Ill. Bell Tel. Co., Inc.*, 721

---

[8]Lt. Hamilton also testified that he approved five to ten time due slips from his subordinates for off-duty BlackBerry work, but he does not remember who turned them in, or when he approved them (Hamilton Dep. at 58-59).

[9]One deposed plaintiff had an overtime slip denied – but for work unrelated to his BlackBerry use (Def.'s Ex. P: Fiduccia Dep. at 32-33).

7

F. Supp. 2d 804, 812 (N.D. Ill. 2010) (internal quotations omitted). To determine whether plaintiffs have met this showing of similarity, "the court reviews a number of relevant factors, including the disparate or shared factual and employment settings of the individual plaintiffs, the various defenses available to the defendant that may be individual to each plaintiff, and fairness and procedural considerations." *Allen*, 2013 WL 146389, at *3.[10]

"If common questions predominate, the plaintiffs may be similarly situated even though the recovery of any given plaintiff may be determined by only a subset of those common questions." *Alvarez v. City of Chicago*, 605 F.3d 445, 449 (7th Cir. 2010). In other words, "certification may be appropriate despite individualized questions and circumstances, if common questions predominate." *Russell*, 721 F. Supp. 2d at 812. It is the plaintiff's burden to show that he and the opt-in plaintiffs are similarly situated enough to allow the collective action to proceed. *Smith v. Safety-Kleen Sys., Inc.*, No. 10-6574, 2012 WL 162206, at *8 (N.D. Ill. Jan. 18, 2012).

## A.

To determine whether plaintiffs are similarly situated on this motion for decertification, we first analyze whether plaintiffs' factual and employment settings are disparate or shared. In making this analysis, "[c]ourts typically consider such factors as location, job duties, supervision, and policies or practices that bind the plaintiffs' claims together." *Camilotes*, 286 F.R.D. at 346. We address these factors below.

## 1.

Defendant's lead argument is that decertification is warranted because plaintiffs have not shown that they are subject to a common policy or practice that violates the FLSA. Specifically,

---

[10]Plaintiffs rely heavily on *Russell*, 721 F. Supp. 2d at 815, as does this Court. Plaintiffs, however, repeatedly misquote and mis-cite this case by quoting language from parenthetical descriptions of different cases and attributing that language to the *Russell* court itself (*see, e.g.*, Pls.' Resp. at 6, 10-11, 18). We admonish plaintiffs' attorneys to take more care in their legal citations in the future.

defendant contends that because CPD's express, written policies and practices on seeking overtime compensation and off-duty BlackBerry use do not violate the FLSA, plaintiffs cannot, as a matter of law, show that defendant has a common policy that violates the FLSA (Def.'s Mem. at 8).

However, as defendant is aware (both from this Court's previous opinions and plaintiffs' pleadings), plaintiffs contend that, notwithstanding CPD's express policies, they were all subjected to a "uniform, undocumented policy" to deny them compensation for off-duty hours they spent doing work on their CPD-issued BlackBerry devices (Pls.' Resp. at 2, 15). While the City accurately notes the existence of an established process for seeking overtime pay and the presence of written policies prohibiting off-duty BlackBerry work, "lawful written (or verbal) policies will not shield the company from liability if plaintiffs can show other company-wide practices that may have been contrary to those policies and violated the FLSA." *Russell*, 721 F. Supp. 2d at 815-16 (holding that the plaintiffs had shown their employer had a common, illegal overtime policy despite the company's written policies that prohibited off-the-clock work because plaintiffs "understood" they were required to work off-the-clock); *see also Brand v. Comcast Corp.*, No. 12-1122, 2012 WL 4482124, at *5 (N.D. Ill. Sept. 26, 2012) (holding that collective actions may be certified based on allegations that the company has an unwritten policy that violates the FLSA despite the lawfulness of the official documented policies); *Madden*, 2009 WL 4757269, at *2 (allowing the plaintiffs to pursue an FLSA collective action based on their employer's alleged common policy not to follow its lawful, written policy, but instead to follow an unlawful, unwritten *de facto* policy).

The City dismisses plaintiffs' claims that CPD had unwritten policies that violated the FLSA as based on speculation and "subjective beliefs or fear[s]" that are not supported by

"credible evidence" (Def.'s Mem. at 9-10). However, sixteen out of the seventeen deposed opt-in plaintiffs testified consistently that they were required to perform off-duty work on their BlackBerry without compensation. In addition, one plaintiff testified that he was told early in his career with BOC that he was not supposed to claim overtime for off-duty time spent on the telephone (Pls.' Resp. at 14 n.44, citing Def.'s Ex. Q: Williams Dep. at 72-73).

Moreover, plaintiffs assert that the nature of their jobs in BOC requires them to respond to calls that arise outside of normal duty hours, and that may occur unpredictably and without advance notice. Thus, plaintiffs contend that the General Orders that prohibit them from receiving compensation for that work (in the 2010 version) or from performing it (in the 2013 version) unless they have prior authorization impose a requirement that cannot be met. In plaintiffs' view, this effectively bars them from receiving overtime compensation for their off-duty work on their BlackBerry devices, and thus supports their claim of an unwritten policy or practice to deny overtime compensation for that work (Pls.' Resp. at 14, 16).

Contrary to the City's argument, the one exception to this common testimony – Lt. Hamilton's testimony that he occasionally submitted time due slips when he spent at least two hours straight working on his BlackBerry off-duty – does not prove the absence of the alleged common, unwritten policy. In fact, Lt. Hamilton testified that he did not submit a time due slip if he worked less overtime on his BlackBerry because "it was part of the job," though he believes he would have been paid if he had submitted a slip for that time (Hamilton Dep. at 49). Moreover, Lt. Hamilton testified that his situation was "somewhat unique to the rest of the department" because his commanders left it up to his discretion as to when he wanted to work overtime; unlike other officers, he did not need to seek pre-approval to work overtime in order to be compensated for that overtime work (*Id.* at 27-28).

10

We recognize that plaintiffs have offered little evidence of statements or actions by defendant that informed their belief that it was unacceptable for BOC police officers to claim overtime for work done using BlackBerry devices. But we disagree with the City that we may assess the credibility of plaintiffs' testimony from the papers. *Cf. Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014) (at summary judgment stage, judge may not make credibility determinations or resolve factual disputes). The time for assessing whether the City maintained an unspoken or unwritten practice that trumped written policy is at trial.

**2.**

Defendant also argues that plaintiffs were not similarly situated because they experienced disparate factual and employment settings in their job duties, supervision and the types of work they performed on their BlackBerrys off-the-clock. Defendant emphasizes the differences in the "highly specialized" four divisions of BOC, including different teams, supervisors, job duties, work shifts, and hours on duty (Def.'s Mem. at 6; doc. # 141: Def.'s Reply at 3). In addition, defendant argues that plaintiffs worked in different locations; some plaintiffs worked primarily in BOC's Homan Square office, while others worked primarily in the field in different geographic areas of the City (Def.'s Reply at 4). Plaintiffs, by contrast, claim that their job duties are "inherently similar" because all members of BOC shared the common goal of combatting organized crime (unlike other officers in CPD), and that the BOC divisions are "amorphous in nature" and overlapping and reinforcing (Pls.' Resp. at 1). Plaintiffs contend that they also performed work in a "similar setting," as they all performed work in "a City-wide context" (*Id.* at 8-9).

Plaintiffs' broad description of "inherent" similarities in their jobs ignores several differences raised by defendant. Many plaintiffs do have different supervisors and teams of

11

subordinates and work in different geographic areas of City even if they work within the same division of BOC. However, these differences are not significant for purposes of defendant's decertification motion, because "common questions predominate." *See Alvarez*, 605 F.3d at 449. As explained above, plaintiffs have set forth enough evidence of a common policy that stretches across the different divisions and job duties within BOC to establish a factual nexus sufficient to proceed as a collective action. The evidence provided by plaintiffs shows that despite their different supervisors and divisions within BOC, opt-in plaintiffs followed the same unwritten policy requiring them to work overtime on their BlackBerrys – to be accessible at all times to respond to all telephone calls and certain emails received while off-duty – without seeking compensation for the work. *Compare Camilotes*, 286 F.R.D. at 346-49 (holding that "significant" factual differences among the plaintiffs' job duties, supervisors, and work settings – over 200 opt–in plaintiffs working in eight different hospitals and 198 different departments – weighed in favor of decertification because defendant did not have a system-wide policy and different supervisors implemented alleged illegal policies differently).[11] Thus, plaintiffs' different teams, supervisors, job duties, work shifts, and hours on duty do not weaken the common questions that unite them.

Nevertheless, defendant argues that there are significant differences in the law enforcement duties performed by plaintiffs that undermine their similarities. As explained by Chief Roti, the Gang Investigations division focuses on long-term investigations of gangs, while

---

[11]After briefing was completed, defendant moved to submit supplemental authority, an opinion in *Mathis et al. v. Darden Restaurants, et al.*, Case No. 12-61742 (S.D. Fla. Sept. 1, 2014), granting a motion for decertification (doc. # 145), and we granted defendant's motion (doc. # 147). *Mathis*, however, is far more analogous to *Camilotes*, 286 F.R.D. 339, than to the instant case. In *Mathis*, the Florida court held that the more than 20,000 opt-in plaintiffs (composed of bartenders and servers) had disparate factual and employment settings because they work across 1,995 restaurants in fifty states; "[t]he relevant policies and practices as to off-the-clock work and wages differ by job title, state, [b]rand, specific restaurant, and manager;" and the opt-in plaintiffs asserted different combinations of three different claims. *Mathis*, No. 12-61742, slip op. at 5-6. Due to the lack of similarities between *Mathis* and this case, defendant's supplemental authority does not alter this Court's analysis above.

12

Gang Enforcement is a street-level unit on the front-line of fighting gang activities. The Narcotics division focuses on Chicago's drug markets, although the drug market is often tied up with gang activity, and the Vice and Asset Forfeiture division involves prostitution and human trafficking and handling and processing assets recovered by other officers. Plaintiffs argue that despite these distinctions, their job duties were inherently similar because they all dealt with "information management" and dissemination (Pls.' Resp. at 5-8).

While plaintiffs again overstate the similarities between their jobs, we find that the differences in their job duties, like the differences in their geographic locations and supervisors, are not significant for purposes of the instant motion for decertification because these differences do not diminish plaintiffs' evidence of a common policy throughout the BOC. The cases cited by defendant are distinguishable (Def.'s Mem. at 16-17). In *Hundt v. DirectSat USA, LLC*, 294 F.R.D. 101, 104-05 (N.D. Ill. 2013), for example, the court granted the defendant's motion for decertification because the differences in the plaintiffs' duties (as elicited during discovery) were significant in that they affected whether the plaintiff employees fell under one of the FLSA's exemptions. Similarly, in *Camilotes*, 286 F.R.D. at 346-49, the court found that the factual differences between the plaintiffs were "significant" in part because the defendant did not have a system-wide policy and different supervisors implemented alleged illegal policies differently.

At bottom, the parties' dispute on this factor of the analysis reduces to a dispute about whether to view the opt-in plaintiffs' job duties microscopically or telescopically. Focusing on enough of the details of the jobs in BOC inevitably will make them appear dissimilar. But, viewed from a broader perspective, the jobs are sufficiently similar to support a collective action – particularly insofar as they pertain to the alleged unwritten policy, which plaintiffs allege did not vary based on the job duties of those who worked in BOC.

**B.**

Beyond its argument that plaintiffs had disparate factual and employment settings, defendant also argues that the Court would have to conduct individualized, fact-intensive analyses to determine how the City's affirmative defenses apply to each individual plaintiff (Def.'s Mem. at 17). In analyzing this factor, the Court considers "whether defendant[']s defenses could be applied across the board to [p]laintiffs' claims and potential [p]laintiffs' claims or whether many and perhaps disparate defenses could be raised." *Camilotes*, 286 F.R.D. at 352 (quoting *Russell*, 721 F. Supp. 2d at 821). We find that this factor weighs in plaintiffs' favor.

In its second affirmative defense, the City argues that injunctive relief is not available for "any plaintiff class member" under the FLSA (Def.'s Affirm. Defense No. 2) (doc. # 120: Def.'s Amended Answer and Affirmative Defenses at 9-10). The interpretation of the availability of injunctive relief under the FLSA is a question of law that would apply to the plaintiff class as a whole and thus would not require individualized analyses for different plaintiffs. Likewise, in its third affirmative defense, the City argues that "all putative class members" must proceed under the CBA's grievance and arbitration procedure (Def.'s Affirm. Defense No. 3). This defense also involves a matter of legal interpretation – of the breadth of the CBA – that would apply to all plaintiffs, rather than individually.[12]

In its fourth affirmative defense, the City contends that plaintiffs cannot state a claim for liquidated damages because the City created and implemented proper overtime compensation procedures (Def.'s Affirm. Defense No. 4). As the City repeatedly points out, its written, established overtime compensation procedures were uniform for all members of the BOC. Thus, this defense would apply similarly to each opt-in plaintiff.

---

[12]In denying the City's earlier motion to dismiss, we disagreed with the defendant's argument that plaintiffs' claims present a "special case" that should proceed through the grievance and arbitration process provided in the CBA. *Allen v. City of Chicago*, No. 10-3183, 2011 WL 941383, at *3-4 (N.D. Ill. Mar. 15, 2011).

Furthermore, the City argues that plaintiffs violated the City's and CPD's established overtime compensation and BlackBerry use policies and procedures (Def.'s Mem. at 21-22), and that these violations give rise to additional affirmative defenses against the opt-in plaintiffs. The City argues that because the putative class members failed to follow the established policies: (1) they should have their damages reduced for failure to mitigate their damages (Def.'s Affirm. Defense No. 6); (2) their claims are barred by the doctrine of unclean hands (Def.'s Affirm. Defense No. 7); and (3) they are estopped from bringing their claims (Def.'s Affirm. Defense No. 8) (*Id*. at 10-11). The City argues that every plaintiff violated the established overtime compensation and BlackBerry use policies, even Lt. Hamilton, who did not always submit his time due slips. Thus, these affirmative defenses, which purportedly arise by virtue of a plaintiff's violation of defendant's established policies, would apply to all plaintiffs and would not require individualized determinations.

The City's fifth affirmative defense can also be applied across the class. The City contends that plaintiffs' claims may be barred in whole or in part by the statute of limitations, which is three years for willful violations of the FLSA and two years for non-willful violations (Def.'s Affirm. Defense No. 5). The City argues that the issue of willfulness requires individualized determinations as to whether plaintiffs' different supervisors had knowledge that plaintiffs were working off-duty on their BlackBerrys and not seeking overtime compensation for that work (Def.'s Mem. at 17-18, 20-21). As the court explained in *Russell*, 721 F. Supp. 2d at 821, however, the statute of limitations defense is not a particularized inquiry where the common policy or practice is alleged to be an unwritten rule understood by everyone.

The remaining affirmative defenses set forth by the City address the specific amount of overtime hours plaintiffs worked. In its first affirmative defense, the City argues that some of the

putative plaintiffs did not work more than the 171 hours in a twenty-eight day period needed before the FLSA requires overtime compensation (Def.'s Affirm. Defense No. 1, citing 29 U.S.C. § 207). The City also argues that to the extent plaintiffs' work hours exceeded 171 hours in a twenty-eight day period, their overtime activities were *de minimis* or otherwise not compensable under the FLSA (Def.'s Affirm. Defense No. 10). Moreover, if not *de minimis*, the City contends that any overtime compensation owed was offset by "premium overtime pay" the City paid to plaintiffs pursuant to the CBAs between the City and plaintiffs' unions (Def.'s Affirm. Defense No. 11).[13]

In our previous opinions in this case, we voiced concerns "regarding the variation in off-duty BlackBerry usage -- including the possibility that the usage was no more than *de minimis* or was offset by 'rank credit' or other 'premium payments' under the CBA." *Allen*, 2013 WL 146389, at *9. However, now that only fifty-three plaintiffs remain in this case, and plaintiffs have put forth sufficient evidence of a common policy that affected them all, the Court's concerns over the feasibility of trying this action collectively have lessened. As in *Russell*, 721 F. Supp. 2d at 821, we do not find that variations in the amounts of overtime allegedly worked by each plaintiff on their BlackBerry will turn the predominantly common questions in this case into issues so particularized that this matter cannot be heard as a collective action. While some plaintiffs' overtime work may ultimately not exceed *de minimis* or offset compensation thresholds, this issue should not be unduly difficult to determine if necessary after we determine whether the City maintains a policy that violates the FLSA.

---

[13]The City also contends generally that plaintiffs' claims may have been waived, discharged, or abandoned (Def.'s Affirm. Defense # 9). But, the City provides no further detail or context to this proposed defense, and thus, we are not concerned at this point that it would lead to any undue individualized inquiries in a trial of this case.

**C.**

The matter of the difficulty (or lack thereof) in maintaining this case as a collective action leads us to the third factor we consider in deciding defendant's motion for decertification: fairness and procedural concerns. These considerations, too, weigh in plaintiffs' favor. Contrary to defendant's arguments (Def.'s Mem. at 23-24), judicial economy would be better served by a collective action of fifty-three opt-in plaintiffs than by fifty-three individual trials.

The City argues that it would be a "monumental burden" to determine the amount of time for which each plaintiff seeks compensation because plaintiffs did not keep track of the time they spent doing off-duty work on their BlackBerry (Def.'s Mem. at 18-19). The Court would either have to review thousands of telephone records and emails, "extrapolat[e] the amount of time certain Plaintiffs worked off-the-clock on their BlackBerrys based on a representative sample, or, alternatively, . . . permit[] each Plaintiff to testify as to his/her individual damages" (*Id.* at 22). The City argues that this burden is "not feasible" for the Court and would be too confusing for a jury (*Id.* at 14, 24).

The City's stated jury concerns are a straw man; plaintiffs have not demanded a jury trial. And, the Court would have to consider the email and telephone records of fifty-three plaintiffs, whether in a collective action or in separate claims by each opt-in plaintiff. Individualized facts as to damages may come from undisputed telephone, payroll and time records, *see Alvarez*, 605 F.3d at 449 n.1, and unreported time "could be reconstructed from memory, inferred from the particulars of the jobs . . . , or estimated in other ways -- any method that enables the trier of fact to draw a 'just and reasonable inference' concerning the amount of time the employee had worked . . ." *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 774-75 (7th Cir. 2013); *see also Driver v. AppleIllinois, LLC*, No. 06-6149, 2013 WL 5818899, at *7-8 (N.D. Ill. Oct. 29, 2013).

Moreover, if need be, this Court can appoint a special master to "resolve a difficult computation of damages," *Alvarez*, 605 F.3d at 449 n.1.

## CONCLUSION

For the foregoing reasons, we deny the City's motion to decertify the collective action (doc. # 127). The matter is set for a status hearing on November 18, 2014, at 9:00 a.m. At that time, the Court will discuss with the parties prospects for settlement and a trial date.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: October 22, 2014**

18