**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JEFFREY ALLEN, Individually and on behalf of other similarly situated employees of the Chicago Police Department, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 10-CV-03183 |
| vs. | ) ) | Magistrate Judge Sidney I. Schenkier |
| CITY OF CHICAGO, | ) ) | |
| Defendant. | ) | |

**DEFENDANT CITY OF CHICAGO'S
RULE 52(c) MOTION FOR JUDGMENT AS A MATTER OF LAW**

Defendant, City of Chicago (the "City"), by its attorneys, respectfully submits its request that this Court enter Judgment as a Matter of Law in the City's favor, pursuant to Rule 52(c) of the Federal Rules of Civil Procedure. In support of its Motion, the City states the following:

## I. INTRODUCTION[1]

Plaintiffs claim they are entitled to additional overtime compensation under the Fair Labor Standards Act ("FLSA") for time allegedly spent using their Chicago Police Department-issued BlackBerry Devices while they were off duty. For purposes of this bench trial, the single issue that this Court set to be tried is "whether the [Chicago Police Department] maintained an unwritten policy that Plaintiffs would not be paid for compensable overtime work performed outside of normal work hours on their Blackberrys." (Transcript of Proceedings on March 9, 2015 at pages 8 and 9).

---

[1] The City previously filed proposed Findings of Fact and Conclusions of Law, which are incorporated by reference herein. The key Proposed Findings of Fact and additional key facts which have now been established by the evidence presented during Plaintiffs' case are set forth below.

In order to prevail on their FLSA overtime claims, at trial, Plaintiffs were required to prove that: (1) they worked overtime without compensation; and (2) the employer knew or should have known of the overtime work. *Blakes v Illinois Bell Telephone Company*, No. 11 CV 336, 2014 WL 6978813,*14 (N.D. Ill. Dec. 10, 2014) (*citing Gaines v K-Five Construction Corp.,* 742 F.3d 256, 270-71 (7th Cir. 2014)); *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177-78 (7th Cir. 2011). Plaintiffs failed to prove both elements.

On August 17, 2015, trial of this matter commenced and Plaintiffs have been fully heard. At the close of Plaintiffs' case, the City requested that this Court enter judgment as a matter of law, because Plaintiffs did not offer evidence to establish their claims, and therefore, Plaintiffs' claims failed as a matter of law. Because Plaintiffs did not present sufficient evidence to support their claim, the City respectfully requests that this Court grant its Motion for Judgment as a Matter of Law under Rule 52(c) of the Federal Rules of Civil Procedure.

## II.     EVIDENCE PRESENTED AT TRIAL

### A.     The Parties

1.      The City of Chicago is a municipal corporation organized and existing under the laws of the State of Illinois. (Pretrial Order, Dkt. 182, Stipulations, p. 6, ¶ 1).

2.      The Chicago Police Department ("CPD") is a public agency of the City. (Pretrial Order, p. 6, ¶ 2).

3.      Named Plaintiff Sergeant Jeffrey Allen ("Sgt. Allen") is a CPD Sergeant employed by the City. (Allen at 29:22-24) (Pretrial Order, p. 6, ¶ 3).

4.      In addition to Sgt. Allen, all of the Opt-in Plaintiffs in this collective action currently work or formerly worked in the CPD's Bureau of Organized Crime ("BOC"). (Pretrial Order, p. 6, ¶ 5).

**B.     The Bureau of Organized Crime**

5.      The BOC is comprised of four (4) divisions, which are Gang Enforcement, Gang Investigation, Narcotics, and Vice and Asset Forfeiture, and each division has its own specific function.  (Pretrial Order, p. 6, ¶ 6).

6.      The Gang Enforcement Division is a street-level unit that conducts search warrants and other "front-line" functions relating to gang activities.

7.      The Gang Investigation Division focuses on conducting sophisticated, long-term investigations of high-level gangs and hyper-violent gang members.  (Spencer at 543:3:7; Inzerra at 403:1-7).

8.      The Narcotics Division focuses on illegal, street-corner, drug markets in Chicago and the surrounding areas and also may conduct longer term investigations.  (Cervenka at 439:23-3; Karuntzos at 353:4-13).

9.      The Vice and Asset Forfeiture Division addresses prostitution and human trafficking (Vice), and the handling and processing of assets (*e.g.*, vehicles and drug money) recovered by officers in BOC and other CPD units (Asset Forfeiture).

10.      Each of the four divisions of the BOC is headed by a Commander.  (Pretrial Order, p. 6, ¶ 7).

11.      Those Division Commanders report to the Deputy Chief of BOC, who reports to the Chief of BOC.  (Pretrial Order, p. 6, ¶ 8).

12.      Each division is comprised of teams led by Lieutenants and Sergeants, who are experienced police officers.  (Pretrial Order, p. 6, ¶ 9).  In the BOC, one Sergeant is generally assigned to supervise a team of Patrol Officers.

13.      Nicholas Roti ("Chief Roti") was the Chief of BOC from 2010 until he retired from the CPD in March of 2015.  Anthony Riccio is the current Chief of BOC.

14.     James O'Grady ("Commander O'Grady") was the Commander of the Narcotics Division from 2008 until October of 2013. When Commander O'Grady was the Narcotics Commander, approximately 300 to 350 officers worked in the division, including approximately three (3) Lieutenants and approximately twenty-six (26) to thirty-four (34) Sergeants at a particular time. Commander Thomas Waldera is the current Commander of Narcotics. (Waldera at 336:6-7).

15.     Leo Schmitz ("Commander Schmitz") was the Commander of the Gang Enforcement Division from January 2009 to January 2012. Commander Kevin Ryan ("Commander Ryan") is presently the Commander of the Gang Enforcement Division. He became the Commander of Gang Enforcement in February 2012. There are typically anywhere from one (1) to three (3) Lieutenants, and twenty (20) to twenty-four (24) Sergeants in Gang Enforcement. There are over 300 officers who work in Gang Enforcement.

16.     Joseph Gorman ("Commander Gorman") was the Commander of the Gang Investigations Division until December 2012. (Gorman at 806:4-7). Commander Christopher Kennedy is the current Commander of the Gang Investigations Division. There are typically three (3) Lieutenants and approximately fourteen (14) to fifteen (15) Sergeants in Gang Investigations. Lieutenants Scott Dedore ("Lt. Dedore") and Plaintiff James Sanchez currently are Lieutenants in Gang Investigations. (Inzerra at 404:7:9).

17.     Commander Kenneth Angarone is the current Commander of the Vice and Asset Forfeiture Division. There is one (1) Lieutenant in the Vice Section and one (1) Lieutenant in the Asset Forfeiture Section, and typically four (4) Sergeants in Asset Forfeiture and approximately seven (7) Sergeants in Vice.

### C.     Plaintiffs and Their Assignments

18.     Plaintiffs currently hold or previously held the following ranks and assignments:

    a.  Gang Enforcement: One (1) Lieutenant and fifteen (15) Sergeants.

    b.  Gang Investigation: One (1) Lieutenant, eight (8) Sergeants, one (1) Detective, and two (2) Police Officers.

    c.  Narcotics: One (1) Lieutenant, fifteen (15) Sergeants, and two (2) Police Officers.

    d.  Vice and Asset Forfeiture: One (1) Lieutenant, five (5) Sergeants, and one (1) Police Officer.

19.    Plaintiffs directly reported to various supervising officers. (*See e.g.*, Karuntzos at 354:9-11; Inzerra at 404:7-9).

20.    For example, Plaintiff Sergeant Diego Flores ("Sgt. Flores") reported to Plaintiff Lieutenant Osvaldo Valdez, Plaintiff Sergeant George Karuntzos ("Sgt. Karuntzos") reports to Lieutenant William Kilroy, Plaintiff Lieutenant Nathan Hamilton ("Lt. Hamilton") reported to Commander Schmitz and then Commander Ryan, and Plaintiff Lieutenant Robert Cervenka ("Lt. Cervenka") reported to Commander O'Grady. (Flores at 445:14-16; Karuntzos at 354:9-11; Cervenka at 490:11-13).

21.    Plaintiffs who are Sergeants generally work the same shifts and hours as their subordinate team members. (*See generally* Williams at 283:4-9).

22.    Plaintiffs also work(ed) in different geographic areas throughout and outside of the City and work(ed) varying hours. (Karuntzos at 361:20-362:2; Inzerra at 446:7-8; Allen at 48:29-23).

23.    The CPD also assigns certain BOC officers to work on task forces jointly with federal, state and county law enforcement agencies. (Spencer at 549:17-22; Karuntzos at 353:4-13).

24.    The Named Plaintiff, Sgt. Allen, filed this action on May 24, 2010 (Dkt. No. 1) and seeks damages for three years prior to May, 2007, claiming a willful violation under the Fair

Labor Standards Act. The opt-in Plaintiffs filed their consents to join this action on December 6, 2013 (Dkt. No. 107), and they seek damages back three years to December 2010, also claiming a willful violation. The statute of limitations periods will be referred to as the "relevant period of time."

25. During the relevant period of time for Sgt. Allen, he worked in the Narcotics Division of BOC until January of 2009, and then the Asset Forfeiture Section of the BOC's Vice and Asset Forfeiture Division from January of 2009 until February of 2010, when he left BOC. (Allen at 28:22-30:2).

26. While assigned to Asset Forfeiture, Sgt. Allen worked on a High Intensity Drug Trafficking Area (HIDTA) task force team that conducted money laundering investigations. (Allen at 30:3-31:4).

27. Members of this HIDTA task force who reported to Sgt. Allen included eight (8) CPD officers, one (1) agent from the federal Drug Enforcement Administration (DEA), and one agent from the Federal Bureau of Investigation (FBI). (Allen at 31:8-15).

28. Sgt. Karuntzos supervises a DEA task force team of approximately eighteen (18) law enforcement officers consisting of eight (8) CPD officers, Illinois State Police troopers, and federal agents, including from DEA and IRS. (Karuntzos at 352:25-353:25, 281:22-282:1).

29. Plaintiff Sergeant Maurizio Inzerra's ("Sgt. Inzerra") duties include supervising a team on a FBI Task Force pertaining to gangs, which consists of FBI agents and state police. (Inzerra at 403:1-7).

30. Plaintiff Sergeant Brad Williams ("Sgt. Williams") supervises a Narcotics Package Interdiction team which is a part of a federally funded HIDTA task force. (Williams at

281:21-282:4).  The Interdiction team consists of seven to eight CPD Patrol Officers and three United States Postal Inspectors.  (Williams at 282:5-11).

### D.    BOC's Use of BlackBerry Devices

31.    In the BOC, exempt level staff, Lieutenants, Sergeants, and certain patrol officers are assigned Department-issued BlackBerrys.  (Lohman at 228:5-7).

32.    Officers assigned to BOC, including Plaintiffs, signed a compliance form when they received the Department-issued BlackBerry, in which they acknowledged that the BlackBerrys were issued as a convenience to enhance on-duty performance and that they would not perform work on the BlackBerrys while off duty, unless they were on a call back assignment, or were directed by a supervisor to immediately perform work.  (*See* JX 1 and 2).

33.    The CPD also issued General Orders, which stated that BlackBerrys "are issued to members as a convenience to enhance on-duty job performance only" and that Department members "are not obligated or required to access, respond to electronic communications, and/or carry the devices on their persons while off-duty."  (*See* JX 3 and 5).

34.    One such General Order, issued by the CPD on August 7, 2013 (the "Electronic Communications GO") (JX 5), stated that off-duty members must "not use a Department-issued electronic communication device to access their Department e-mail account, respond to electronic messages, or perform other work related to department business unless the member is officially on a 'call-back' assignment" or 'is directed by a supervisor to immediately perform any work.'"

35.    The Electronic Communications GO provides that if Plaintiffs are requested to perform work using the BlackBerrys, the general timekeeping overtime procedures should be followed.  (JX 5) (Fiduccia at 192:24-193:1).

36.    Plaintiffs, as BOC officers, were required to review and be aware of these General Orders.

37.    On October 30, 2013, Chief Roti issued a memorandum to high-ranking BOC officers in which he reiterated that BOC officers with BlackBerrys were required to follow the 2013 General Order and the compliance statements, and that such officers were not required to monitor and respond to communications on their BlackBerrys while off duty.  (*See* JX 6).

38.    As directed by Chief Roti, the memorandum was ultimately distributed throughout BOC.

39.    Plaintiffs communicated on their BlackBerrys with various types of civilians, other CPD divisions, and outside law enforcement professionals in the performance of their job duties.  (*See e.g.*, Lohman at 235:12-21; Karuntzos at 361:15-19).

40.    For example, Sgt. Spencer occasionally communicated with confidential informants; Sgt. Williams, Sgt. Inzerra, Sgt. Allen and Sgt. Karuntzos communicate (or communicated) with federal agents; and several Plaintiffs testified that they communicate with CPD officers who work in districts (and not BOC).  (Spencer at 549:7-9; Inzerra at 403:1-7; Karuntzos at 354:20-25; Allen at 41:4-11; Williams at 173:6-11).

41.    Plaintiffs testified that the General Order is a guideline, which they did not feel they were obligated to follow given the unique nature of their job in BOC.  (*See e.g.*, Williams at 296:12-15) ("I feel general orders are guidelines.").

42.    The General Orders and the Compliance Statements apply to all CPD members who are issued BlackBerrys, not just BOC officers, and restrict the off duty use of those devices.

43.    The applicable Collective Bargaining Agreements and the CPD's directives relating to timekeeping address compensation and the payment of overtime.

### E.    The Applicable Collective Bargaining Agreements

44.    The applicable collective bargaining agreements ("CBAs") entered into by the City and the respective unions that separately represent Plaintiffs who are Patrol Officers and Detectives, Sergeants or Lieutenants working in BOC, require the City to pay these officers overtime compensation at a rate of time and one-half their regular hourly rate for hours worked in excess of the normal tour of duty and for hours worked on scheduled days off.

45.    The CBAs also require overtime compensation to be paid when the officers are called back to work after their normal work day for an official assignment, including court time, with a minimum of two (2) hours of overtime or actual time, whichever is greater.  (Cervenka at 505:17-506:5; Allen at 67:12-19).

46.    Pursuant to the governing CBAs, Plaintiffs receive a greater overtime benefit than is required by the FLSA, because they receive CBA overtime compensation if they work beyond their regular tour of duty, which is generally eight (8) hours (with a ½ hour unpaid meal period) in any given day, even if they do not work more than 171 hours in a 28-day police period.

47.    With regard to BOC officers who work on federal task forces, the federal government reimburses the CPD for a certain amount of overtime compensation that is paid by the CPD to its BOC officers assigned to the task forces.  (Karuntzos at 382:4-7; Inzerra at 423:16-21, 311:1-12).

48.    For Sgt. Allen's assigned federal joint task force unit, the federal government reimbursed the CPD up to $14,000, annually, per CPD officer, including Sgt. Allen, for overtime compensation CPD paid to its officers assigned to that federal joint task force.  (Allen at 73:7-18).

49.    For the DEA joint task force team led by Sgt. Karuntzos, the federal government reimbursed the CPD for up to approximately $17,000, annually, per CPD officer, including Sgt.

Karuntzos, for overtime compensation CPD paid to its officers assigned to that task force team. (Karuntzos at 382:4-7).

50. With regard to Sgt. Williams' Narcotics Package Interdiction team, the federal government reimburses the CPD approximately $9,500, annually, for himself and the other CPD officers on his team, for overtime compensation CPD paid to these officers assigned to that federal joint task force. (Williams at 311:5-312:5).

**F.    The CPD's Established Process for Reporting and Being Compensated for Overtime**

51. The CPD has established a process for reporting additional time worked and receiving overtime compensation under the CBA and the FLSA for its FLSA non-exempt police officers, including those assigned to BOC. (*See e.g.*, Williams at 306:5-11; Karuntzos at 379:24-380:3; Flores at 466:1-3; Spencer at 564:14-17).

52. After the additional time is worked, that officer submits a "Time Due Slip" or "yellow slip" that documents the time worked and the supervisor's approval, and the Time Due Slip is then further processed through payroll to ensure the officer is compensated for the additional time worked. (Fiduccia at 178:2-7; Williams at 307:5-17; Flores at 466:4-12; Cervenka at 516:17-25; Spencer at 565:18-20).

53. Most Plaintiffs have never had a Time Due Slip denied. (*See e.g.*, Williams at 312:6-8; Washburn at 607:17-19; Washburn at 607:17-19).

54. While certain BOC officers sought preapproval to work overtime, due to the urgent and specialized nature of their work, there are occasions where these Plaintiffs have worked beyond their normal scheduled hours and subsequently received approval from their supervisor to work and be paid overtime compensation for the time; in these instances, Plaintiffs were paid overtime compensation for the additional time worked, even though they did not

receive preapproval. (Lohman at 263:3-13; Williams at 306:8-25, 316-22-25, 320:5-8; Cervenka at 517:1-7; O'Grady at 735:11-736:21; Schachelmayer at 533:11-14).

55.    The Time Due Slip contains a box entitled "Explain Assignment." (Williams at 308:24-309:5; O'Grady at 738:8-12). The entries in this box typically contain only a few words, such as "search warrants," "Investigation Blue Night," "Operation Blue Night," and "long-term investigation." (O'Grady at 738:8-22).

56.    Further, when explaining their assignment in this box, Plaintiffs generally state the nature of the overtime work performed (e.g., working on a particular investigation), but they generally do not provide written detail regarding how they performed the work (e.g., by reviewing and drafting e-mails or making and receiving phone calls on their BlackBerry). (Fiduccia at 180:25-181:6, 181:19-182, 183:4-186:16).

57.    Patrol Officers in BOC submit their Time Due Slips to their Sergeant. (Spencer at 565:512; Fiduccia at 180:2-8; Williams at 309:23-25; O'Grady at 736:22-737:1). When the Sergeant authorizes the slip, it is forwarded to the Lieutenant. (Williams at 210:1-4; Spencer at 565:512). When the Lieutenant approves the slip, the slip is forwarded to the CPD Timekeeper so the Patrol Officer can be paid for the additional time worked.

58.    Sergeants in BOC submit their Time Due Slips to their Lieutenant. (Fiduccia at 179:4-6; Flores at 468:2-4). When the Lieutenant approves the slip, the slip is forwarded to the CPD Timekeeper so the Sergeant can be paid for the additional time worked. (Schachelmayer at 531:9-12).

59.    Certain Lieutenants may review and approve as many as fifty Time Due Slips in a day, and many more if they are returning from a regular day off or supervising additional teams

for a Lieutenant who is off or on furlough. (Waldera at 348:2:12; O'Grady at 737:14-24, 742:16-20).

60.     Commanders generally do not review Time Due Slips of BOC Patrol Officers and Sergeants who have worked beyond their normal hours. (O'Grady at 737:5-12).

61.     Lieutenants in BOC submit their Time Due Slips to their Commander. (O'Grady at 734:12-735:9).

62.     The former Chief of BOC, Nicholas Roti, did not review Time Due Slips as part of his job duties. (Roti at 980:9-11)

63.     If a supervisor had a phone call with a subordinate officer while that officer was off duty, the supervisor may not know that the subordinate was off duty and/or, when reviewing Time Due Slips, would not necessarily notice whether the subordinate submitted a Time Due Slip for the time spent on such phone call, assuming the subordinate was off duty. (O'Grady at 694:6-14, 729:25-732:3, 744:17-745:3; Karuntzos at 377:23-378:3).

64.     If a supervisor sent or received to or from a subordinate officer an e-mail while that officer was off duty, the supervisor may not even know that the subordinate was off duty and/or, when reviewing Time Due Slips, would not necessarily notice whether the subordinate submitted a Time Due Slip for the time spent drafting such e-mail, assuming the subordinate was off duty. (O'Grady at 694:6-14, 729:25-732:3).

65.     Most, if not all, of Plaintiffs' alleged off duty work utilizing their BlackBerrys occurred in various places outside the physical presence of their supervisors. (Karuntzos at 377:23-3; Inzerra at 422:3-6; O'Grady at 729:25-730:25).

66.     Supervisors generally would not know that a Plaintiff performed work off duty on a BlackBerry, for example, by speaking with a confidential informant, calling or e-mailing

subordinates to change the start time or meeting location for the next day's shift, or talking on the phone with a CPD officer who worked in a unit outside of BOC, or a representative from an outside law enforcement agency. (*See generally* O'Grady at 729:12-730:3)

**G. Plaintiffs Are Aware of and Understand How to Follow the CPD's Process for Reporting and Being Paid for Additional Time Worked**

67. Plaintiffs are aware of and understand the CPD's policies and practices relating to overtime compensation. Plaintiffs are responsible to initiate the process to receive overtime compensation. (Fiduccia at 177:24-178:4; Karuntzos at 380:23-381:2).

68. Plaintiffs routinely work(ed) additional hours beyond their regularly scheduled hours and follow the CPD's established policy and practice and submit Time Due Slips to be paid overtime compensation for the additional time worked, and they have, in fact, been compensated for such work. (Fiduccia at 178:12-189:12; Spencer at 564:2-566:18, 566:14-567:7).

69. Over the course of their careers, some of the Plaintiffs, including Sgt. Allen and Sgt. Flores reported to the CPD a discrepancy between the compensation they received and the time actually worked and the CPD corrected the discrepancy, so that those Plaintiffs were fully compensated for the time they submitted. (Allen at 69:24-70:19; Flores at 452:10-22).

70. During the relevant time period, there have been no specific restrictions on the use of overtime for officers working in BOC.

71. There was never a specific limit on the amount of overtime BOC officers could work and BOC did not have the same level of scrutiny over its use of overtime and could easily justify the need for having its officers work overtime given the nature of the work they perform. (Washburn at 605:19-606:1; O'Grady at 733:12-25).

72.     The CPD has never questioned overtime worked by Sgt. Karuntzos' team. (Karuntzos at 382:18-383:1).

73.     Sgt. Allen and his team worked the hours that were needed to perform the required work.  (Allen at 73:4-14).

74.     During 2012, Sgt. Fiduccia worked between 12 and 16 hours a day during the 2012 NATO Conference.  (Fiduccia at 177:17-21).

75.     Plaintiff Sergeant Lawrence Stec is not aware of any general limitation restricting the amount of overtime hours worked.

76.     The CPD has a process in place by which officers can review their time records and correct errors when they are not paid for all time they actually worked, and several of the Plaintiffs used that process to make sure that they were paid for all time worked.  (Allen at 69:24-70:19; Flores at 452:10-22).

77.     Over the course of their careers, some of the Plaintiffs, including Sgt. Allen and Sgt. Washburn reported to the CPD a discrepancy between the compensation they received and the time actually worked and the CPD corrected the discrepancy, so that those Plaintiffs were fully compensated for the time they submitted.  (Allen at 69:24-70:19; Washburn at 608:25-609:8).

78.     All Plaintiffs testified that their practice of not requesting overtime existed before the 2010 and 2013 General Orders were issued and they did not change their practice as a result of the General Orders.  (Lohman at 267:8-17; Williams at 295:8-14, 296:12-15; Cervenka at 510:5-9; Schachelmayer at 528:11-20; Fiduccia at 216:1-6; Spencer at 575:9-15; Washburn at 609:10-24; Fiduccia at 190:3-191:10).

**H.    The CPD Did Not Maintain an Unwritten Policy that Plaintiffs Would Not Be Paid For Compensable Overtime Work Performed Off Duty On Their BlackBerrys**

79.    Except for Sergeant Fiduccia (based on an overtime request not relating to any work performed on his BlackBerry), no Plaintiff has had a request for overtime compensation denied during the relevant time period.  (*See* O'Grady at 742:6-9) (stating that he never denied an officer's Time Due Slip).

80.    Supervisors who are approving Time Due Slips trust their supervisors working under them that the overtime worked was necessary.  (O'Grady at 739:22-740:7).

81.    Plaintiffs presented no evidence that they ever submitted a request for overtime compensation for performing specific tasks which were accomplished in part by use of a Department issued electronic device, and any such request was denied.

82.    If presented with a Time Due Slip from a subordinate for work performed on a BlackBerry while off duty, Commander O'Grady, Commander Schmitz and Commander Gorman all would approve the slip.  (O'Grady at 749:8-16, 751:9-13).

83.    If a subordinate of Sgt. Inzerra had submitted a Time Due Slip for work performed off duty on an electronic device, Sgt. Inzerra would have approved the slip and forwarded it to his Lieutenant, even if his subordinate had submitted five such Time Due Slips on five consecutive days.  (Inzerra at 424:23-425:9).

84.    If a subordinate of Sgt. Schachelmayer had submitted a Time Due Slip for work performed off duty on their BlackBerry, Sgt. Schachelmayer would have approved the slip. (Schachelmayer at 538:23-539:10).

85.    Commander O'Grady and Commander Gorman have approved Time Due Slips for a subordinate's work performed on a BlackBerry while off duty, but may not have been

aware as to whether the work was performed using a BlackBerry, because the slip may not have expressly stated such.

86.     No Plaintiff was instructed or directed *not* to submit a Time Due Slip to be paid for work performed on the BlackBerrys while off duty.  (Lohman at 259:21-25, 260:1-4; Allen at 81:18-20, 122:19-23;  Karuntzos at 381:1-10;  Inzerra at 424:5-9;  Flores at 462:16-19; Schachelmayer at 531:16-18; Washburn at 602:8-11).

87.     On two (2) occasions, Commander Kennedy encouraged Sgt. Fiduccia to submit a Time Due Slip to be paid for work Sgt. Fiduccia had performed on his BlackBerry while off duty.  (Fiduccia at 215:6-11).

88.     No one discouraged any Plaintiff from submitting a Time Due Slip to be paid for work performed on the BlackBerrys while off duty.  (Fiduccia at 176:10-12; Lohman at 260:19-23;  Waldera at 348:13-15;  Karuntzos at 396:24-397:1;  400:22-401:6;  Inzerra at 424:10-12; Flores at 462:12-15; Schachelmayer at 531:13-15; Spencer at 562:4-7, 562:12-18; Washburn at 602:15-17).

89.      No Plaintiff was told he/she would not be paid for work performed on the BlackBerry while off duty.   (Fiduccia at 176:13-18; Lohman at 260:25-261:3;  Williams at 314:11-18; Inzerra at 424:13-15; Flores at 464:4-8; Cervenka at 509:6-9; Schachelmayer at 531:22-25; Spencer at 562:19-21; Washburn at 602:15-17).

90.     No BOC officer, including any Plaintiff, has been formally disciplined or removed from BOC, or from a particular assignment in BOC, for not being responsive on a BlackBerry while off duty.  (Fiduccia at 176:21-177:8; Williams at 312:2-19; Allen at 79:24-80:3; Waldera at 342:5-19, 344:14-23; Karuntzos at 389:9-21; Inzerra at 426:24-427:10; Flores

at 465:18-466:5; Cervenka at 508:20-509:5; Schachelmayer at 532:10-12, 532:23-533:1; Spencer at 563:7-564:1; Washburn at 602:22-603:10).

91. Chief Roti, Commander O'Grady and Commander Gorman have not and would not "frown upon" or "look down upon" a subordinate who submitted a Time Due Slip to be paid for work performed on the BlackBerry while off duty. (*See also* Inzerra at 426:3-8 (stating that nothing any of his supervisors did or said led him to believe submitting a time due slip for work on a BlackBerry would be frowned upon)).

92. Chief Roti, Commander O'Grady, Commander Gorman and Commander Waldera would have not and would not formally discipline or admonish a subordinate who submitted a Time Due Slip to be paid for work performed on the BlackBerry while off duty. (Waldera at 348:20-22).

93. According to Chief Roti, Commander O'Grady and Commander Gorman, there have not been and there would be no repercussions taken against a BOC officer, including a Plaintiff, because he/she submitted a Time Due Slip to be paid for work performed on the BlackBerry while off duty.

94. Chief Roti, Commander O'Grady, and Commander Gorman have not removed and would not remove any officer from BOC, or from a team or unit within BOC, or recommend such removal, because that BOC officer, including any Plaintiff, submitted a Time Due Slip and requested to be paid for work performed on the BlackBerry while off duty.

95. No Plaintiff ever disciplined a subordinate because they were not responsive on their BlackBerry while off duty. Schachelmayer at 532:20-22.

96.     No Plaintiff ever asked a supervisor whether they could be paid for time worked on the BlackBerry while off duty.  (Lohman at 261:3-6; Schachelmayer at 532:1-5; Spencer at 562:22-25).

97.     Sgt. Fiduccia is a personal friend of Chief Roti and Commander Angarone. (Fiduccia at 193:7-23).  Sgt. Fiduccia never discussed the subject of whether he could be paid for time worked on the BlackBerry while off duty with Chief Roti or Commander Angarone. (Fiduccia at 193:24-12).

98.     BOC officers, including Plaintiffs, never raised any concern or complaint to any supervisor or union representative that they were not being paid for time they allegedly were working on their BlackBerry while off duty, nor have they filed any grievance making such claim.  (Fiduccia at 219:8-22; Waldera at 349:8-10; Karuntzos at 379:12-15; Flores at 472:23-473:4; Spencer at 567:2-4; Spencer at 567:2-4).

**I.     Plaintiffs Were Not Required To Monitor Their BlackBerrys At All Times While Off Duty**

99.      Pursuant to CPD policy, every CPD police officer, including BOC officers, must keep an active phone number on file in the event the officer needs to be contacted in an emergency while he/she is off duty.  (Cervenka at 507:19-508:2; Flores at 468:22-25).

100.    If a BOC officer, including Plaintiffs, needed to be contacted off duty in an urgent situation, the officer's supervisor would contact him/her by calling them on the phone.  (*See*, *e.g.*, Cervenka at 508:15-19).

101.    When Chief Roti and Commander O'Grady e-mailed subordinate officers, they did not necessarily know if the officers were on or off duty.

102.     Many of the e-mails Plaintiffs received while they were off duty did not need to be answered immediately, and could have waited until their next tour of duty began.  (Williams at 288:6-9; Inzerra at 422:16-20).

103.     For example, 70 to 75 percent of the off duty communications Sgt. Allen received did not require an immediate response.  (Allen at 40:11-22).

104.     Fiduccia testified that some BOC officers use their out-of-office message on their BlackBerry when they are off duty.  (Fiduccia at 189:10-14).

105.     The majority of e-mails received by Plaintiffs did not state that an immediate response was needed.  (Allen at 103:8-104:15).

106.     If an e-mail was of an urgent matter, the contacting supervisor would call the responding officer if there was no response to the e-mail.  (Cervenka at 495:4-9).

107.     When Chief Roti, Commander O'Grady and Commander Gorman e-mailed BOC subordinates who were off duty, these supervising officers did not expect the subordinates to respond to the e-mail until they were back on duty, unless the supervisors stated otherwise in the e-mail.

108.     Plaintiffs understood that if they needed to be reached in an emergency, they would be called.  (Lohman at 232:22-25, 266:12-14; Allen at 66:23-25).

109.      Several Plaintiffs chose not to monitor their e-mails, or they turned off the BlackBerry phone "ringing" feature, when they slept.   (Fiduccia at 189:16-23; Lohman at 266:9-11; Cervenka at 491:21-493:5; Washburn at 607:20-23).

110.     No Plaintiff went through any analysis to select e-mail exemplars.  (PX-1)  Those exemplars were not specifically selected by any Plaintiff.  (*See e.g.* Fiduccia at 203:9-12).

111.    No Plaintiff went through any analysis to select the phone exemplars that are contained in PX-2.  (Lohman 270:6-8; Fiduccia at 197:1-198:4).

112.    For virtually all telephone calls identified in PX-2, Plaintiffs did not have an independent recollection of the subject matter of any call.  (Williams at 322:8-324:20; Fiduccia at 198:6-23; Lohman at 270:21-23).

113.    Sgt. Schachelmayer's eight e-mail exemplars (PX-1-103-110) included two e-mails which Schachelmayer admitted were actually on-duty.

114.    Plaintiffs' telephone exemplars in many cases reflect several days within a twenty-six day (or lesser) time period where they had no calls of any kind, let alone related to work.  (Fiduccia at 201:5-20).

115.    Plaintiffs' e-mail exemplars were limited to a single e-mail chain on each of the e-mails selected for a single day.  (PX-1).

**J.      Plaintiffs Were Not Required to Review "CPIC" E-mails While Off Duty**

116.    The CPD sends out mass Crime Prevention and Information Center ("CPIC") e-mails or  "blast" e-mails, which describe crimes or potential criminally related incidents occurring City-wide to hundreds of CPD supervisory recipients department-wide, including certain command level and supervisory BOC officers.  (Allen at 33:23-34:10).  Non-exempt BOC officers are not required or expected to review CPIC e-mails while they are off duty. (O'Grady at 757:9-13).

117.    Plaintiffs who received and reviewed CPIC e-mails off duty did so as a personal choice and were not directed or required to review those e-mails off duty.

118.    If Plaintiffs received CPIC e-mails off duty that may have been pertinent to their jobs, they could have reviewed the CPIC e-mails when their next tour of duty began.

119. Certain officers in BOC, such as those in Asset Forfeiture and task force team members, chose not to receive CPIC notices. (Flores at 451:8-16).

120. When Sgt. Allen worked in BOC, he programmed his BlackBerry device so that CPIC e-mails were directed to an Outlook e-mail account, *i.e.*, the CPIC e-mails did not go to his BlackBerry. (Allen at 39:8-40:10).

121. According to Sgt. Allen, it was "not imperative" for him to access information in CPIC e-mails immediately. (Allen at 39:8-13). Sgt. Karuntzos no longer receives CPIC e-mails. (Karuntzos at 362:23-363:12).

## III.  APPLICABLE LEGAL STANDARD

"[I]n a bench trial, once a party has been fully heard on an issue, the 'court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue,'" pursuant to Federal Rule of Civil Procedure 52(c).  *Aviles v. Cornell Forge Co.,* 241 F.3d 589, 592 (7th Cir. 2001) (granting judgment as a matter of law to the employer on the plaintiff's discrimination claim after the close of the plaintiff's case).

In 1991, Rule 52(c) was added to the Federal Rules of Civil Procedure to streamline bench trials "by authorizing the judge, having heard all the evidence the plaintiff has to offer, to make findings of fact adverse to the plaintiff, including determinations of credibility, without waiting for the defense to put on its case, since the evidence presented by the defendant would be unlikely to help the plaintiff."  *Wsol v. Fiduciary Management Associates, Inc.*, 266 F.3d 654 (7th Cir. 2001).  In ruling on a motion for judgment under Rule 52(c), the court may "weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies." *International Union of Operating Engineers, Local Union 103 v. Indiana Const, Corp.*, 13 F.3d 253 (7th Cir. 1994).  The rule further dictates that such a judgment must be supported by

findings and fact and conclusions of law, which will not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. *Aviles v. Cornell Forge Company*, 241 F.3d 589, 592 (7th Cir. 2001).

## IV. PLAINTIFFS FAILED TO ESTABLISH THAT THE CITY MAINTAINED AN UNWRITTEN POLICY THAT PLAINTIFFS WOULD NOT BE PAID FOR COMPENSABLE OVERTIME WORK PERFORMED OUTSIDE OF NORMAL WORK HOURS ON THEIR BLACKBERRYS

Plaintiffs did not establish by a preponderance of the evidence that the City maintained an unwritten policy that Plaintiffs would not be paid for compensable overtime work performed on their BlackBerrys while off duty. Plaintiffs' contention of such an unwritten policy is belied by the undisputed and credible evidence for each of the reasons that follow.

First, the uncontested testimony of the Commanders who testified in Plaintiffs' case in chief established that if they had received a Time Due Slip that the Commander knew was for compensable work performed off duty using the BlackBerry, they would have approved it. Indeed, even Plaintiff Inzerra testified that if a subordinate of his had submitted a Time Due Slip for work performed off duty on an electronic device, Sgt. Inzerra would have approved the slip and forwarded it to his Lieutenant, even if his subordinate had submitted five such Time Due Slips on five consecutive days. In addition, as the evidence shows, the Commanders could have reviewed and approved (and likely did review and approve) Time Due Slips for off duty work performed on BlackBerrys without even knowing it, because the Time Due Slips most likely would not have even reflected that the work was performed using a BlackBerry.

A second reason why Plaintiffs cannot prevail is based on Plaintiffs' admissions. Plaintiffs admit that no supervisor: (1) ever instructed them not to report overtime; (2) discouraged the submission of overtime claims for time worked; (3) refused to pay for overtime when a claim was submitted; or (4) told them that they would not be paid for the time worked.

*See Boelk v. AT&T Teleholdings, Inc.*, No. 12 CV 40, 2013 WL 3777251, at *8 (W.D. Wis. July 19, 2013) (plaintiffs offered no evidence that the defendants instructed them not to report overtime, told them to delete overtime reported on their timesheets, or that they refused to pay them for reported overtime.)

Third, the evidence shows that no Plaintiff was disciplined -- or even informally admonished -- for submitting overtime compensation requests. To the contrary, the undisputed evidence shows that when Plaintiffs submitted for numerous hours of overtime compensation, they received it during the relevant time period.

Fourth, Plaintiffs presented no evidence that there was any policy to place a specific restriction on overtime worked in BOC[2] and, in fact, Plaintiffs testified that they were not only allowed to work the overtime required to get the job done, but some were also encouraged to increase their overtime hours, because of specific law enforcement circumstances requiring additional hours to be worked. The evidence that was presented established that the CPD imposed no specific restrictions on the working of overtime or implemented any timekeeping mechanisms that would discourage the reporting of overtime worked in BOC. Several Plaintiffs testified that they were free to work however many hours required to get the job done and most testified they never had a Time Due Slip denied during the relevant time period. Former Chief Roti testified that there was never a limit on the amount of overtime his officers could work in BOC and BOC did not have the same level of scrutiny over its use of overtime and could easily justify the need for having its officers work overtime given the nature of the work they perform.

Fifth, for numerous BOC officers, including four of the Plaintiffs, assigned to the joint task forces, the federal government reimbursed the City, up to a certain significant dollar

_____

[2] The only evidence was references to internal communications to manage overtime.

amount, for overtime expenses for each CPD officer assigned to that team. Therefore, there would be no incentive for the CPD to restrict, discourage or deny any alleged overtime work by those BOC officers.

Sixth, although Plaintiffs testified that they believed that they could not seek compensation for time using their BlackBerrys to perform work beyond their regular shifts or it would be "frowned upon," such belief is not tantamount to an unwritten policy. Further, Plaintiffs failed to put forth evidence to substantiate their belief that they would not be compensated for time worked off duty on the BlackBerrys. Plaintiffs' testimony that it was expected of them and that their jobs required them to be responsive around the clock on their BlackBerrys is insufficient to establish that there was an unwritten policy that they *then* would not be compensated when they did have to respond. Even accepting Plaintiffs' testimony as true that their supervisors required that they had to be responsive off duty on their BlackBerrys that, by itself, does not equate to an unwritten policy that the officers would not be compensated for the time they actually spent responding.

The decisions in both *Boelk*, 2013 WL 3777251, and *Blakes*, 2014 WL 6978813, are instructive here. The court in both cases granted the employer summary judgment as to the FLSA claims of several employees for failing to produce sufficient evidence that the employer had knowledge those employees were working overtime *and* not being paid for the compensable time. *Boelk*, 2013 WL 3777251 at *8 (plaintiffs offered no evidence that the defendants instructed them not to report overtime, told them to delete overtime reported on their timesheets, or that they refused to pay them for reported overtime.). Relying on the Eleventh Circuit's decision in *Allen v. Board of Public Education*, 495 F.3d 1306, 1320-21 (11th Cir. 2007), the district court in *Blakes* held that plaintiffs' contentions that Illinois Bell's policies encouraged the

practice of underreporting time to avoid discipline and accusations of insubordination were insufficient to show that any of his supervisors ever pressured him to underreport time or threatened him with discipline if he did not.  Even granting Blakes every reasonable inference, the court held no reasonable jury could conclude that Illinois Bell knew or should have known that Blakes was working through lunch without reporting his time.  *Blakes*, 2014 WL 6978813 at *15; *see also Butler v. DirectSAT USA, LLC,* 55 F.Supp.3d 793, 803 (D. Md. Oct. 16, 2014) ("Decisions from the Fourth Circuit and this court have held that evidence of *occasional* after-hours work is not sufficient to raise a genuine dispute of material fact that the employer was on notice of the employee's *consistent* overtime work for a *long period of time.") (Emphasis in original and internal citations omitted).*  Further, even generalized statements that an employer discouraged overtime or that an employer was informed of off the clock work were insufficient to overcome summary judgment in favor of the employer in *Blakes*, 2014 WL 6978813.

Plaintiffs failed to carry their burden for a seventh reason.  The City has established a reasonable process for the Plaintiffs to report additional hours worked and to seek compensation for that work; therefore, the City cannot be liable for nonpayment of alleged off-duty compensable work if the Plaintiffs failed to follow that established process. *See Schremp*, No. 2012 WL 3113177, at *3.  No evidence was presented by Plaintiffs to show that the process was onerous or was unreasonable to follow.  To the contrary, BOC officers, including Plaintiffs, made use of these procedures regularly, submitting Time Due Slips to be compensated for significant amounts of overtime worked.  Employers have the right to require employees to keep track of their work time and where an employee elects to under-report his or her work time, the employer is not liable for the failure to pay unreported overtime under the FLSA.  *Schremp*, 2012 WL 3113177, at *2.

Moreover, Circuit Courts have "declined to place the onus on employers to ferret out work that is not reported under its reasonable procedures." *See Hertz v. Woodbury County, Iowa,* 566 F.3d 775, 784 (8th Cir. 2009) (police officers who were required to submit paperwork for overtime pay had burden to show they performed work during uncompensated meal period; they were in best position to do so and holding otherwise would "perversely incentivize employers to keep closer tabs on employees during their off-duty time"); *Newton v. City of Henderson,* 47 F.3d 746, 749–50 (5th Cir. 1995) (reversing summary judgment in favor of employee officer who was required to accurately report hours worked, was paid for all hours he reported, but sought compensation for unreported work time; officer did not produce sufficient evidence regarding employer's knowledge, and it was reasonable for supervisors to rely on officer's payroll submissions "as a reliable indicator of the number of hours worked"); *Forrester v. Roth's I.G.A. Foodliner, Inc.,* 646 F.2d 413, 414 (9th Cir. 1981) (affirming grant of summary judgment to employer where store employee was required to report overtime on time sheets, was paid for all hours he reported, and did not raise material issue of fact as to employer's knowledge); *see also Hinterberger v. Catholic Health System*, 299 F.R.D. 22, 45 (W.D. N.Y. 2014).

Further, although CPD's policy generally requires preapproval for working additional hours beyond the normal shift, the evidence established that BOC officers routinely worked and were compensated for overtime work without seeking preapproval, because of the nature of their duties did not always allow for the opportunity to seek approval before the work was performed.

Additionally, Plaintiffs' claim that the General Orders and the Compliance Statement "prohibited" or "expressly forbid" them from seeking compensation for off-duty work using BlackBerrys is also not supported by the evidence. Moreover, the General Orders and the

Compliance Statement allow for the exact circumstances in which Plaintiffs are claiming that they are utilizing their BlackBerrys off duty, which is being directed by a supervisor, either by a phone call or an e-mail, to perform work. To the extent that BOC officers, including Plaintiffs, were performing work off duty using their BlackBerrys for other purposes, certain Plaintiffs testified that the GO is only a guideline for BOC given the nature of the work. Equally important is the undisputed testimony that BOC officers, including Plaintiffs, routinely worked additional hours, submitted hundreds of Time Due Slips, and were paid overtime compensation for those additional time worked. There is no relevant evidence that any Time Due Slip was ever denied, including requests to be compensated for off duty worked performed on BlackBerrys.

To the extent that Plaintiffs deliberately chose not to follow the City's established procedures for requesting to be paid overtime compensation for additional work beyond their scheduled hours, the City should not be liable under the FLSA. *See Boelk*, 2013 WL 3777251, at *6 (*citing Harvill v Westward Communications, LLC*, 433 F.3d 428, 441 (5th Cir. 2008) (if employee "deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of the [FLSA.]")).

 Eighth, as the issue for trial as framed by this Court acknowledges, Plaintiffs' claims that the City had knowledge that they were working on their BlackBerrys off duty is, by itself, insufficient to establish that there was an unwritten policy not to compensate officers for such time worked. *Blakes*, 2014 WL 6978813, *12-15. As the *Hertz* court determined that even where the employer has access to non-payroll records (in that case, the Computer Aided Dispatch records that reflected when an officer called on and off duty), employers are not obligated "to weed through non-payroll" records to determine if employees were working

beyond their regularly scheduled hours, especially where there is a process in place for submitting overtime claims. *Hertz,* 566 F.3d at 782.

The same is true here. The evidence established that BOC officers routinely worked and submitted Time Due Slips for overtime compensation. Supervisors review and approve hundreds of Time Due Slips, and they would not be able to trace back whether a particular subordinate officer worked additional hours to ensure every officer reported every time they may have worked additional hours. In order to shield itself from the potential appearance of an unwritten policy that would deny overtime compensation, the City is not obligated under the FLSA to take on the onerous administrative burden to match up officers' phone records and e-mail accounts and their scheduled work hours to determine which calls were made or e-mails read or sent off duty, whether the calls/e-mails were required work (assuming someone could determine that from just a phone number), and then check to see if that particular officer later requested overtime through the established process. *See Hertz,* 566 F.3d at 782; *Jones-Turner v. Yellow Enterprise Systems, LLC*, 14-cv-5497, 2015 WL 64592, *5 (6th Cir. 2015); *Newton v. City of Henderson*, 47 F.3d 746, 749 (5th Cir. 1995) ("If we were to hold that the City had constructive knowledge that Newton was working overtime because [the supervisor] had the ability to investigate whether or not Newton was truthfully filling out the City's payroll forms, we would essentially be stating that the City did not have the right to require an employee to adhere to its procedures for claiming overtime.").

Ninth, the testimony clearly established that Plaintiffs' alleged off duty time work on the BlackBerrys was, for the most part, outside the presence and knowledge of their supervisors. However, even if the supervisor is the one making the call or sending the e-mail to the subordinate, that supervisor may not know whether the officer is on duty or not, given the

fluidity of work schedules based on the nature of the work of BOC officers. And even if the supervisor knew the officer's duty status, given the volume of Time Due Slips submitted, there can be no reasonable expectation that the supervisor would remember the previous contact days later when he or she is reviewing Time Due Slips to determine if the officer submitted one for the prior call or e-mail, assuming that supervisor even reviewed that particular subordinate's Time Due Slips.

For all of the foregoing reasons, both singularly and in combination, the Court concludes that Plaintiffs have failed to satisfy their burden to prove that the Chicago Police Department "maintained an unwritten policy that Plaintiffs would not be paid for compensable overtime work performed outside of normal work hours on their Blackberrys."

## V.     CONCLUSION

WHEREFORE, Defendant, City of Chicago, respectfully requests that this Honorable Court grant this Motion and enter Judgment as a Matter of Law in favor of Defendant, pursuant to Federal Rule of Civil Procedure 52(c).

Date:  August 21, 2015                          Respectfully submitted,

                                                CITY OF CHICAGO

                                                By:  /s/ Jennifer A. Naber
                                                     One of Its Attorneys

Joseph M. Gagliardo
Jennifer A. Naber
James J. Convery
Matthew P. Kellam
Lily M. McNulty
Laner Muchin, Ltd.
515 N. State Street, Suite 2800
Chicago, Illinois 60654
(312) 467-9800
(312) 467-9479 Fax

<u>**CERTIFICATE OF SERVICE**</u>

Jennifer A. Naber, an attorney, hereby certifies that she caused the **Defendant City of Chicago's Rule 52(c) Motion for Judgment as a Matter of Law**, in the above-captioned matter, to be served via the electronic filing system to the Clerk of Court, and via the electronic filing system to the parties of record listed below, on this 21st day of August 2015, addressed to:

Paul D. Geiger
Law Offices of Paul D. Geiger
540 North Frontage Road, Suite 3020
Northfield, Illinois 60093
pauldgeiger@gmail.com

Ronald C. Dahms and Sean Charles Starr
135 S. LaSalle Street
Suite 3300
Chicago, Illinois 60603
rdahmslaw@yahoo.com
seanstarrlaw@gmail.com

/s/Jennifer A. Naber
One of its Attorneys