UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JEFFREY ALLEN, Individually and    )
on behalf of other similarly situated    )
employees of the Chicago Police    )    **Case No. 10 C 3183**
Department,    )
    )    **Magistrate Judge Sidney I. Schenkier**
    Plaintiffs,    )
    )
v.    )
    )
CITY OF CHICAGO,    )
    )
    Defendant.    )

## MEMORANDUM OPINION AND ORDER[1]

Jeffrey Allen, a sergeant in the Chicago Police Department ("CPD"), filed this action on

May 24, 2010, on behalf of himself and current and former police personnel assigned to CPD's

Bureau of Organized Crime ("BOC") (collectively, "plaintiffs") against the City of Chicago

("the City"). In their complaint (amended on October 5, 2010), plaintiffs allege that the City

willfully violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. Plaintiffs

allege that CPD required them to use their BlackBerry devices to be available to access work-

related emails, phone calls and messages while they were off duty, and that they in fact received

many such communications and performed work using their BlackBerry devices while off duty.

Plaintiffs allege they were not compensated for the work involved in receiving and following up

on these communications, because CPD maintained an unwritten policy to deny plaintiffs

compensation for off-duty work they performed on their CPD-issued BlackBerry devices (doc. #

25: Am. Compl. ¶¶ 2, 17).

---

[1]On December 21, 2010, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule
73.1(b), this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 35, 38).

On March 15, 2011, the Court denied a motion to dismiss. *Allen v. City of Chicago*, No. 10-3183, 2011 WL 941383 (N.D. Ill. Mar. 15, 2011). Thereafter, on January 14, 2013, the Court granted conditional certification of the following opt-in class:

> A Sworn Member at or below the rank of Lieutenant who has been employed by the Chicago Police Department in the Bureau of Organized Crime, and who has been in possession of a Department issued BlackBerry Device and who has worked a minimum of 171 hours, including uncompensated off duty hours, over a twenty-eight (28) day pay period at least once during the past three years; and has used a Department issued BlackBerry for work purposes while off-duty during at least one of the aforementioned pay periods.

*Allen v. City of Chicago*, No. 10-3183, 2013 WL 146389, at *1 (N.D. Ill. Jan. 14, 2013).

Notice of the lawsuit and consent forms were mailed to potential class members on February 27, 2013. Seventy-five persons returned signed consent forms opting to join this action. On January 31, 2014, we dismissed twenty-three of those persons for want of prosecution due to their failure to respond to discovery requests (doc. # 115). In addition, Sgt. Maureen Laurich requested to withdraw as a plaintiff in this case on August 3, 2015 (docs. ## 188, 189). We granted her request and terminated her as a plaintiff in this case on August 5, 2015 (doc. # 190). Thus, fifty-one plaintiffs, consisting of patrol officers, sergeants and lieutenants who were issued a BlackBerry while working in the BOC, remain in the case.

On October 22, 2014, after completion of discovery, we denied the City's motion to decertify the conditional class. *Allen v. City of Chicago*, No. 10-3183, 2014 WL 5461856 (N.D. Ill. Oct. 22, 2014). On March 9, 2015, in an oral ruling, the Court denied the City's motion for summary judgment (doc. # 172). At that time, the Court bifurcated the case and set the matter for trial on the threshold issue of whether the CPD maintained an unwritten policy not to pay plaintiffs for compensable work performed outside of normal work hours on their CPD-issued BlackBerry devices.

Twenty-four witnesses testified at the trial, which ran from August 17 to August 21, 2015, with closing arguments on August 24, 2015.[2] Both sides submitted proposed findings of fact and conclusions of law before trial (docs. ## 191, 192), as well as revised proposed findings of fact after the trial (docs. ## 217, 218).

This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). The Court has considered and weighed all admissible evidence, including the testimony of witnesses and the exhibits admitted at trial, and we have adopted certain proposed findings only to the extent they are supported by the evidence presented at trial, as described below. To the extent that any of the Court's findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

## LEGAL STANDARD

We begin with a brief overview of the governing legal principles (some of which we will discuss more fully below), which will provide context for the findings of fact that follow.

The FLSA's overtime provision requires that employees receive a premium wage (one and one-half times the regular rate of pay) for each hour of overtime that they work. For many employees, the requirement to pay overtime is triggered when a person is "employ[ed] for more than forty hours in one work week. 29 U.S.C. §§ 206(a), 207(a). Employees of a public agency who are engaged in law enforcement activity -- as are plaintiffs here -- earn overtime on a different basis: they are entitled to receive overtime for all "hours worked" in excess of 171

---

[2]Witnesses consisted of various sergeants and lieutenants who are plaintiffs in this case as well as commanders and other lieutenants who testified in their role as supervisors of various plaintiffs. In addition, the Court accepted into evidence the parties' designations from plaintiff Patrol Officer Vincent Mancini's deposition transcript, because he could not appear at trial due to illness.

hours during a 28-day work period. 29 C.F.R. § 553.230(c).[3] The FLSA defines the term "employ" as "to suffer or permit to work," 29 U.S.C. § 203(g), but the Act does not define "work." The Supreme Court has filled that gap, explaining that "work" is an activity "controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005) (internal citations and quotations omitted).

To succeed on their FLSA claim, plaintiffs must prove, by a preponderance of the evidence, that they performed overtime work for which they were not properly compensated. *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173 (7th Cir. 2011); *Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 507-08 (7th Cir. 2007) (holding that in FLSA overtime case, like in other federal civil cases, the burden of proof is proof by a preponderance of the evidence). In addition, plaintiffs must show that the City had actual or constructive knowledge that plaintiffs worked overtime without compensation because "the FLSA stops short of requiring the employer to pay for work it did not know about, and had no reason to know about." *Kellar*, 664 F.3d at 177 (citing 29 U.S.C. § 203(g) ("'Employ' includes to suffer or permit to work."); 29 C.F.R. § 785.11 ("The employer knows or has reason to believe that he is continuing to work")).

## FINDINGS OF FACT

As explained above, the trial focused on the question of whether the City maintained an unwritten policy to deny plaintiffs payment for compensable off-duty work they performed on their CPD-issued BlackBerry devices. Below, we set forth our findings of fact, which were

---

[3]Although the Department of Labor's interpretative regulations do not have the force of binding law, courts may rely on them as "persuasive evidence both of Congress's legislative and the Secretary [of Labor]'s regulatory intent." *Blakes v. Ill. Bell Tel. Co.*, 77 F. Supp. 3d 776, 781 n.2 (N.D. Ill. 2015) (quoting *Howard v. City of Springfield*, 274 F.3d 1141, 1146 (7th Cir. 2001)).

proven by a preponderance of the evidence at trial, relating to the existence or non-existence of this alleged unwritten policy.[4]

## I.

Plaintiffs are (or, at the relevant time, were) members of the Bureau of Organized Crime. Former Chief of BOC, Nicholas Roti, testified that the number of sworn police officers assigned to BOC was "generally in the nine hundreds" (Tr. 991-92). BOC is a "no-bid" unit within CPD, meaning BOC members are assigned to the bureau at CPD's discretion. The BOC is a prestigious, coveted assignment. The work of BOC is widely considered the highest level work within CPD, and an important stepping stone to further advancement.

The BOC is comprised of four divisions: Gang Enforcement, Gang Investigations, Narcotics, and Vice and Asset Forfeiture. Each division is headed by a commander, who supervises one to three lieutenants; each lieutenant, in turn, supervises approximately ten to forty sergeants. Each sergeant supervises a group of patrol officers. Each division commander typically reports to the deputy chief of BOC, who in turn reports to the chief of BOC. The lieutenants, sergeants and patrol officers work in different locations in and around Chicago, depending on the geographic areas to which they are assigned.

The Gang Enforcement division primarily functions as a street-level tactical unit that responds to front-line gang activities in real time. Sixteen of the plaintiffs currently work or have worked in this division, including several who testified at trial: Lt. Nathan Hamilton, Sgt. Maurizio Inzerra, Sgt. Robert Lohman and Sgt. Joseph Schachelmayer.[5]

---

[4]As used in these Findings and Conclusions, "JX" refers to the joint exhibits admitted into evidence, "PX" refers to plaintiffs' exhibits admitted into evidence, and "DX" refers to defendant's exhibits admitted into evidence.

[5]Some plaintiffs -- such as Sgt. Inzerra -- worked in more than one division during the relevant time period.

The Gang Investigations division primarily focuses on conducting sophisticated, long-term investigations of gangs and gang members. Twelve plaintiffs currently work or have worked in the Gang Investigations division, including several who testified at trial: Sgt. James Fiduccia, Sgt. Inzerra, Sgt. Darrell Spencer and Sgt. James Washburn.

The Narcotics Division primarily focuses on street-corner, mid-level and high-level narcotics trafficking, but also conducts longer term investigations. Nineteen plaintiffs currently work or have worked in the Narcotics division of BOC, including a number who testified at trial: Sgt. Jeffrey Allen, Lt. Robert Cervenka, Sgt. George Karuntzos, Sgt. James Padar, Sgt. Laurence Stec and Sgt. Brad Williams.

The Vice and Asset Forfeiture division deals with prostitution and human trafficking, and handles and processes assets recovered by officers in BOC and other CPD units. Seven plaintiffs currently work or have worked in this division, including two who testified at trial: Sgt. Allen and Sgt. Diego Flores. The CPD routinely assigns BOC officers to work on joint task forces with federal, state and county law enforcement agencies.

## II.

The lieutenants, sergeants and certain patrol officers within BOC are issued BlackBerrys, which they use to assist them in performing work both on and off duty, primarily through telephone and email communications. Plaintiffs presented evidence that they regularly communicate both on and off duty via their CPD-issued BlackBerrys with their superiors, their subordinates, confidential informants ("CIs") and other law enforcement agencies in conjunction with police investigations.

In addition to plaintiffs' testimony, their attorneys assembled a binder of "Email Exemplars" (PX1) and "Phone Record Exemplars" (PX2) in an attempt to demonstrate that

plaintiffs performed work activities, within the meaning of the FLSA, on their BlackBerrys. While some of the emails in PX1 were brief, merely informational, and plainly did not require an immediate response, other emails required plaintiffs -- while off duty -- to follow up by communicating with other officers or performing additional research. For example:

- Lt. Cervenka received and responded to emails from the Chief Roti while he was off duty, asking if Lt. Cervenka's team was heading to the scene of a police shooting (PX1-014, PX1-018). Lt. Cervenka testified that he had to contact people on his team after receiving such emails (Tr. 500).

- Sgt. Fiduccia received and responded to emails off duty from Lt. James Sanchez regarding the need for him to keep an eye on a particular district and have his guys "play" and "monitor" certain areas (PX1-021). Sgt. Fiduccia also received emails about shootings while he was off duty from Cmdr. Christopher Kennedy (PX1-026-028, 032-033) and from Lt. Scott Dedore (PX1-029-030). Sgt. Fiduccia testified that he made telephone calls in conjunction with email exchanges like this to gather information for his superiors as soon as possible (Tr. 152-54).

- Sgt. Inzerra received an email from Lt. Sanchez when he was on furlough (PX1-054). Sgt. Inzerra's response required him to reach out to everyone on his team (Tr. 415-16).

- Sgt. Karuntzos received some emails requiring follow up from other agencies as a result of his joint task force activities. One example was an email from James Walsh of the Department of Justice requesting advice, to which Sgt. Karuntzos responded that he "will discuss it" and get back to Mr. Walsh (PX1-068). Sgt. Karuntzos testified that in addition to responding via email, he was required to make additional telephone calls and perform other follow up (Tr. 369).

- Sgt. Lohman received emails while he was off duty from then-Lt. (and former plaintiff) Thomas Waldera regarding late evening shootings, in response to which Sgt. Lohman had to promptly arrange his team's response (PX1-083, 086, 088).

- Sgt. Schachelmayer responded to requests by Lt. Waldera to gather information on certain warrants, contraband and investigations while Sgt. Schachelmayer was off duty, and to a request by Cmdr. Leo Schmitz on a Sunday to make sure his teams were placed to assist in a possible increase in shootings (PX1-103-04, 108). Sgt. Schachelmayer testified that he needed to promptly make follow-up telephone calls and emails in response to these emails from his superiors (Tr. 526-27).

- Sgt. Spencer received an email from Lt. Sanchez telling him to reach out to his CI and get an update while Sgt. Spencer was off duty (PX1-113). Sgt. Spencer testified that he had to review additional emails and make work-related telephone calls in response to this email (Tr. 558).

- Sgt. Stec conducted follow up in response to an email he received while off duty from Cmdr. Eric Carter regarding narcotics complaints from an alderman (PX1-125).

Other plaintiffs were required to perform substantial off-duty work using their BlackBerrys due to their unique positions within BOC. Sgt. Washburn testified that as the only supervisor in the "tech lab" at BOC, he was obligated to be available and responsive on his BlackBerry at all times to assist in other police officers' investigations by retrieving video and "pinging" -- or locating -- telephones. PX1 contains several emails to and from Sgt. Washburn that required him to respond while he was off duty (*see, e.g.,* PX1-133, 138, 142). Likewise, Sgt. Williams testified that he held a unique position as supervisor of a Midwest HIDTA ("High Intensity Drug Trafficking Area") task force that required him to be available on his BlackBerry to be ready to assist in the interception of packages containing suspected contraband at any time. PX1 contained examples of these types of communications that he in fact received (*see, e.g.,* PX1-149, 152).

Plaintiffs routinely kept their BlackBerry telephone ringer on while they were off duty, including during the night. Most plaintiffs testified that they felt obligated to "monitor" their BlackBerrys while off duty in case they received a telephone call from someone that required an immediate response. They would endeavor to answer every call they received on their Department-issued BlackBerry, because that was the means by which they would likely be contacted if there was an emergency that required their immediate response, whether the calls came from their supervisors, subordinates, other agencies or CIs. When they received these calls, plaintiffs testified that they often had to respond not only to the individual calling them, but that they also had to perform additional follow-up action, including follow-up calls and research.[6]

---

[6]The BlackBerry telephone records in PX2 did little to give context to these calls, as most plaintiffs testified that they simply assumed that the telephone calls to their BlackBerry numbers were "work-related," and

8

That said, many emails plaintiffs received off duty did not require them to respond while they were off duty. In addition, some of the plaintiffs' responses to emails received while off duty consisted of little or no follow-up work. Sgt. Stec testified that his off-duty responses did not always consist of any follow-up work (Tr. 672-73), and Sgt. Inzerra testified that some of his email responses consisted of only quick, one-minute responses (Tr. 434).

Several BOC members -- including Lt. William Kilroy, Chief Roti, and Sgts. Inzerra, Padar and Schachelmayer -- testified that they regularly turned off the email notification feature on their BlackBerrys at night or kept their BlackBerrys out of their bedroom so that they would not interfere with their sleep. In addition, Sgt. Flores testified that he turned his BlackBerry off while he was on furlough (Tr. 469-70). Sgt. Stec received emails from his supervisor indicating that he could wait until he was on duty to respond (PX1-128, 130).

Other plaintiffs testified that they ignored Mass Crime Prevention and Information Center ("CPIC") emails while off duty. CPIC emails describe crimes or potential crime-related incidents and other emergency situations that occur City-wide. These emails are sent to hundreds of CPD members, including certain command level and supervisory BOC officers. Sgt. Allen programmed his BlackBerry so that he would not receive notifications of CPIC emails, and Sgt. Karuntzos testified that he had not received CPIC emails for several years. Of the plaintiffs who testified, only Sgts. Fiduccia, Lohman, Schachelmayer and Williams said they felt obligated to read CPIC emails off duty, in order to track and provide information about violence in their areas of investigation; but, they usually did not perform any immediate follow-up work after reviewing the CPIC emails.

---

they could only guess at the source of the telephone numbers listed. We therefore do not find the call records in PX2 to be persuasive evidence of off-duty work.

The evidence established that plaintiffs did not use their BlackBerrys solely, or even principally, as a device to allow for off-duty work. However, the evidence showed that the BlackBerry devices were a primary means of communication with their teams, supervisors, subordinates, CIs and other agencies. While not every response to a phone call, or review or follow up on an email, constituted compensable work activity, we find that plaintiffs have proven that at least some of their off-duty BlackBerry activity qualifies as such.

## III.

CPD has a long-established process for police officers to use when seeking overtime compensation. CPD's process requires officers to fill out and submit "time due slips" (*i.e.*, "overtime/compensatory time reports") to their supervisors for work they perform while off duty. The overtime slips are then processed through payroll to ensure the officer is compensated for the additional time worked. These half-page slips (an example is DX7) provide a small space, labeled "Explain Assignment," for the officer to fill out stating the work that was done. The space is too small to allow for a detailed explanation of the work performed. Police officers who completed the form typically described in just a handful of words the work done (*e.g.*, "kennel cough investigation, set up traffic stop" (Sgt. Inzerra, Tr. 430); "Press release" (Sgt. Fiduccia, Tr. 184)). Lt. Kilroy testified that the descriptions of the work set forth on the time due slips are "almost always very general and vague" (Tr. 1156). When completing the forms, officers do not typically set forth the location or manner in which the work was performed; thus, it is not usually possible to tell from the time due slips if and when an officer was submitting a slip for off-duty work done using a BlackBerry.

At least three plaintiffs testified that they submitted time due slips for off-duty work they performed on their BlackBerrys (although the time due slips did not specify that the work was performed on their BlackBerrys), and they were compensated for this work:

- Lt. Hamilton submitted time due slips for overtime that included work on his BlackBerry when he worked a minimum of two hours overtime, and he has approved time due slips he knew were submitted by his subordinates for off-duty work performed using a BlackBerry.

- Sgt. Padar submitted approximately 20 time due slips for processing investigative alerts from home, which included work on his BlackBerry.

- Sgt. Neal Schultz submitted time due slips stating that he performed off-duty work via phone and email.

In addition, BOC Sgt. Mark George, who is not a plaintiff in this case, submitted multiple time due slips for fielding calls on his BlackBerry while off duty because he has unique expertise in animal crimes. And, the testimony established that the following three plaintiffs may have submitted time due slips for off-duty work they performed on their BlackBerrys:

- Sgt. Dave Betz submitted time due slips for completing administrative reports while off duty, which may have included BlackBerry work.

- Sgt. Fiduccia submitted a time due slip for drafting a press release while off duty, which he may have done using a Department-issued electronic device.

- Sgt. Inzerra submitted time due slips for obtaining and sharing information relating to an investigation, which work may have been done on his BlackBerry.

The City offered additional evidence that time due slips submitted for work done off duty on a BlackBerry were approved. Lt. Konow and Cmdr. Kevin Ryan testified that they approved time due slips for off-duty BlackBerry work from their subordinates. Cmdr. Ryan approved such slips for "gang school safety teams," who use their CPD-issued BlackBerrys and iPads while off duty to monitor social media to interdict gang violence among school-aged youths. In addition, Lt. Konow not only submitted multiple time due slips herself for work she performed on her

BlackBerry while off duty (such as for giving guidance by telephone regarding asset forfeiture questions), but she has also approved time due slips from her subordinates for off-duty work they performed using a BlackBerry.

There was also evidence presented at trial that supervisors may have unknowingly approved time due slips for off-duty BlackBerry work. As we explained above, time due slips are half-page forms that provide minimal space in which to explain *what* work was performed, and they do not require an officer to explain *how* the work was performed. The witnesses who testified to submitting slips for off-duty BlackBerry work noted on the time due slips the nature of the overtime work they performed or the name of the investigation, but they did not indicate on those slips that they used a BlackBerry to perform the work while off duty.[7]

We find the credible evidence showed that some members of the BOC submitted time due slips for off-duty work they performed on their BlackBerrys, and that these time due slips were approved. Nevertheless, many plaintiffs credibly testified that they did not submit time due slips for work they performed while off duty on their BlackBerrys. Because we find that at least some plaintiffs performed work using the BlackBerrys while off duty and did not submit time due slips for that work, we turn next to the central issue at trial: plaintiffs' contention that they did not submit time due slips to receive compensation for off-duty BlackBerry work because the City maintained an illegal, unwritten policy not to pay them for that work.

## IV.

At trial, plaintiffs attempted to show the existence of an unwritten policy not to compensate them for off-duty work performed on their BlackBerrys through evidence of: (1) a

---

[7]Two plaintiffs -- Lt. Hamilton and Sgt. Schultz -- wrote on at least some slips that they performed overtime work was by email or telephone, but there was no evidence that any time due slip specified that off-duty work was completed on a "BlackBerry."

common understanding within BOC that they should not turn in time due slips for off-duty work performed on their BlackBerrys; (2) language in CPD General Orders and in compliance statements police officers were required to sign when they were issued BlackBerrys; (3) discouragement from supervisors, which led plaintiffs to believe that turning in slips for off-duty BlackBerry work might jeopardize their positions within BOC; and (4) CPD pressure to decrease the amount of overtime being worked and paid. We address each of these points in turn.

## A.

Plaintiffs contend that there was a uniform culture, or belief, within BOC that it was not acceptable for members to turn in time due slips for off-duty work performed on their BlackBerrys. For the reasons we explain below, we find that the evidence failed to establish such a shared culture or belief.

## 1.

Some plaintiffs, such as Sgt. Stec, testified that they never submitted slips for off-duty BlackBerry work because they believed no one submitted such slips, and they thought submitting slips for this work would be frowned upon due to the culture within BOC (Tr. 636, 655-56, 684). However, these plaintiffs' subjective belief was not universally shared. Sgt. Stec's testimony (and similar testimony from some other testifying plaintiffs) contrasts starkly with the BOC members, including some plaintiffs, who did turn in time due slips for off-duty BlackBerry work, and were compensated for it. We find that this is strong evidence against the existence of a uniform culture or unwritten policy as alleged by plaintiffs.

## 2.

Despite some BOC members submitting time due slips for off-duty BlackBerry work, plaintiffs contend that they have nevertheless shown that there was a pervasive culture within

13

BOC not to compensate for this work. Plaintiffs offered evidence that supervisors in BOC generally were aware that plaintiffs at times did off-duty work on their BlackBerrys -- and, in some instances, knew that a particular officer did so on a particular date. But, we find plaintiffs have failed to prove that supervisors knew if and when particular officers failed to submit time due slips for off-duty BlackBerry work.

Like Sgt. Stec, some supervisors within BOC -- namely Lts. Cervenka and Kilroy -- testified that they believed time due slips were not turned in for off-duty BlackBerry work because it was contrary to the culture within BOC (Tr. 494, 1167). However, Lts. Hamilton and Konow testified that they have knowingly approved time due slips that their subordinates submitted for off-duty BlackBerry work. The evidence further showed that Lt. Kilroy may have unknowingly approved time due slips from Sgt. Padar for off-duty work he completed on his BlackBerry for processing investigative alerts from home. Lt. Kilroy testified that he did not know whether his subordinates completed their work on a BlackBerry because the time due slips generally do not state how the off-duty work was performed.

Moreover, Lts. Kilroy and Dedore testified that they review so many time due slips each day -- up to 100 for Lt. Dedore and up to 120 for Lt. Kilroy -- that even if they knew a plaintiff had performed off-duty work on a BlackBerry, it would be impractical to verify whether a time due slip was turned in for that work. In addition, Lts. Kilroy and Hamilton testified that they may not review time due slips until one or more days after they are generated by their subordinates, making it even more difficult to match up particular off-duty work to a specific slip.

The evidence also showed that plaintiffs' supervisors often were not aware when plaintiffs were working off duty. Most plaintiffs testified that their off-duty BlackBerry work occurred outside the physical presence of their supervisors, at plaintiffs' homes or other locations

while off duty. Much of plaintiffs' off-duty activities using their BlackBerrys took place with individuals other than their direct supervisors. Depending on their particular assignment, plaintiffs communicated off duty on their BlackBerrys with a variety of individuals, including CIs, federal agents, other CPD divisions, subordinates, and other supervisors within BOC. Plaintiffs' direct supervisors would not be aware in these instances when, why or with whom plaintiffs were communicating on their BlackBerrys while off duty.

Even if a plaintiff's off-duty work was done at the request of a supervisor, that supervisor would not invariably know that he or she was requesting work to be performed while a plaintiff was off duty. Although some plaintiffs said they worked consistent shifts and hours (Sgt. Flores, for example, testified that he consistently worked the night shift), other plaintiffs (including Lt. Hamilton and Sgts. Allen, Inzerra and Karuntzos) testified that their shift hours frequently changed -- sometimes daily -- depending on the needs of their work. In such situations, as Lt. Kilroy and Cmdr. O'Grady testified, supervisors may not know whether their subordinates were on or off duty when they contacted them.

We find that plaintiffs have failed to show that supervisors within BOC routinely knew if or when plaintiffs were working off duty on their BlackBerrys without submitting time due slips for the work.

**B.**

Plaintiffs contend that General Orders and compliance statements that the City issued in 2010 and 2013 created or furthered an unwritten policy of denying plaintiffs payment for off-duty BlackBerry work, because they created insuperable obstacles to receiving compensation for this work. For the reasons we explain below, we find that this evidence fails to demonstrate the unwritten policy that plaintiffs assert.

15

**1.**

On October 13, 2010, CPD issued General Order ("G.O.") 98-07-09 (also sometimes referred to as "the 2010 General Order"), five months after the instant lawsuit was filed. There was scant evidence presented at trial about the deliberative process that went into its promulgation.[8] The text of G.O. 98-07-09 states that it was intended to "establish[] guidelines and responsibilities of members using Department-issued electronic communication devices" (JX3: G.O. 98-07-09, § 1.A).

The 2010 General Order states that BlackBerry devices "are issued to members as a convenience to enhance on-duty job performance only," and Department members "are not obligated or required to access, respond to electronic communications, and/or carry the devices on their person while off-duty" (*Id.*, §§ 3.A and 3.B.1). Furthermore, with regard to compensation, the 2010 General Order states that:

> Members accessing their Department e-mail account, responding to electronic messages, or using a Department-issued electronic communication device related to Department business will not be compensated unless the member is officially on a "call-back" assignment as defined by existing labor contractual agreements or the member is directed by their superior to immediately perform a substantial task with overtime authorization from the superior directing the request.

(*Id.*, § 3.C).[9] A note under Section 3.C states that "[t]his guideline includes accessing electronic messages using personally owned electronic communication devices" (*Id.*).

---

[8]While the testimony at trial did not specifically link the 2010 General Order to the filing of the lawsuit, Chief Roti testified that after the lawsuit, CPD's legal, management and labor affairs departments began looking at policy and having meetings to develop guidelines regarding some of the issues raised in the lawsuit (Tr. 942, 1012).

[9]The City attached a copy of the July 2007 through June 2012 collective bargaining agreement ("CBA") between the City and the sergeants' union to their response to plaintiffs' motion to conditionally certify the class (doc. # 79: Def.'s Resp. to Mot. for Cond'l Cert., Ex. B). We may take judicial notice of the CBA. *See Minch v. City of Chicago*, 486 F.3d 294, 300 (7th Cir. 2007) (taking judicial notice of a CBA that the Chicago City Council had formally adopted and enacted into law, because courts may take judicial notice of local ordinances, historical documents, and documents contained in the public record); *see also* Fed. R. Evid. 201(b). The CBA defined a "call-back" as "an official assignment of work . . . which does not continuously precede or continuously follow a Sergeant's worked hours" (*Id.* at § 20.4). The CBA further stated that "[s]ergeants who are called back or who are

G.O. 98-07-09 also introduced an Electronic Communication Device Compliance Statement, CPD-65.109 (G.O. 98-07-09, § 1.C.). This form, which officers were required to sign upon receiving a BlackBerry, repeated the same language above regarding when an employee may be compensated for using the BlackBerry for Department business while off duty (JX2).

Plaintiffs contend that the 2010 General Order's stated prerequisites to receiving compensation for off-duty BlackBerry work -- being on a call-back assignment or being directed by a superior to immediately perform a substantial task with overtime authorization -- were often impossible to meet. *First*, although the CBA defines call-back assignments, many plaintiffs -- including Sgts. Fiduccia, Karuntzos, Stec and Williams -- testified that they had never been on a call-back assignment, and some plaintiffs were unsure how even to define the term. Chief Roti, Cmdr. O'Grady and Lt. Cervenka testified that they thought a "call-back" meant that an officer was physically brought back to work at a particular work location. Only one witness -- Sgt. Padar -- testified that he had ever checked the box for "call-back" on a time due slip; but, we note that he checked this box for processing investigative alerts from his home on his BlackBerry (Tr. 1089, 1101).

*Second*, most plaintiffs testified that they often faced circumstances where they had to perform off-duty BlackBerry work without first being directed and authorized by a superior to perform it. Plaintiffs testified that their off-duty BlackBerry work could result from sources other than supervisor requests: for example, from another officer working on a joint task force or from dealings with a CI. Thus, according to plaintiffs, they often could not meet this requirement of obtaining supervisory "pre-approval" -- as it was referred to at trial -- in order to receive compensation for off-duty BlackBerry work.

---

required to report to any location for work on a regular day off shall be compensated for two (2) hours at the appropriate overtime rate or for the actual time worked, whichever is greater, at the overtime rate" (*Id.*).

However, the evidence showed that the requirements of the 2010 General Order were not as immutable as plaintiffs suggest. To begin with, the 2010 General Order itself states that it is a "guideline." And, in fact, the evidence made clear that neither plaintiffs nor the City treated the 2010 General Order as imposing unyielding requirements. The 2010 General Order said that CPD members were not obligated to carry or respond to BlackBerrys while off duty, a statement that the plaintiffs appear uniformly to have ignored (we do not say that to be critical, but rather to underscore how the general order was regarded.) And, we note that neither plaintiffs nor any other CPD member ever filed a grievance asserting that the 2010 General Order and/or compliance statement imposed preconditions to seeking compensation for overtime work that were impossible to meet.

Moreover, despite the absence of pre-approval, various BOC members (listed above) submitted and/or approved time due slips for off-duty BlackBerry work. This was consistent with the practice with respect to off-duty work performed without using a BlackBerry, where plaintiffs testified that they would often work (and get paid) for off-duty work activity even without pre-approval if it was impractical to obtain prior approval, or if their supervisors simply trusted them to known when the off-duty work was necessary.

We also note that many testifying plaintiffs had only a very general -- and often incomplete -- understanding of the terms of the 2010 General Order as it pertained to BlackBerry use. Some plaintiffs, such as Sgt. Stec, testified that they read the General Order as stating that employees would not be compensated for off-duty BlackBerry work (Tr. 684) -- which clearly is inconsistent with even the most restrictive reading of the General Order. Moreover, plaintiffs uniformly testified that the 2010 General Order and compliance statements had no effect on their practice with regard to working off duty on their BlackBerrys and submitting, or not submitting,

time due slips for this work. The plaintiffs who turned in time due slips and were compensated for off-duty work they performed on their BlackBerrys -- and the supervisors who testified that they approved such slips -- did not testify that this practice changed depending on whether the plaintiffs received pre-approval before working off duty on their BlackBerrys. Conversely, none of the plaintiffs who testified that they refrained from submitting time due slips for off-duty BlackBerry work said they refrained from doing so because of the 2010 General Order and associated compliance statement.

**2.**

On August 7, 2013, G.O. G09-01-05 ("the 2013 General Order") was issued, which revised Section 3.C of the October 2010 order, regarding compensation for off-duty BlackBerry work. The other sections of the 2010 General Order mentioned above remained unchanged.

The language of Section 3.C was modified to state that:

> Off-duty members will not use a Department-issued electronic communication device to access their Department e-mail account, respond to electronic messages, or perform other work related to Department business unless the member is officially on a "call-back" assignment as defined by existing labor contractual agreements or the member is directed by a supervisor to immediately perform any work and overtime is authorized by the supervisor directing the request. If there is a request and approval for overtime, the Department member must comply with the applicable Department directives concerning the submission of an Overtime/Compensatory Time Report (CPD-11.608). If overtime is not approved, the member is not to perform the work.

(JX5: G09-01-05). The Electronic Communication Device Compliance Statement was revised to conform to the amended language in G.O. G09-01-05 (JX1).

Unlike the 2010 General Order, the 2013 General Order did not simply state that CPD members would not be compensated for off-duty BlackBerry work if they were not on a call-back or if they did not receive pre-approval by a supervisor to perform the overtime work. Rather, the 2013 General Order stated that off-duty members "*will not*" use their CPD-issued

19

BlackBerrys to perform Department work if they did not meet these prerequisites. Furthermore, the 2013 General Order stated that if the prerequisites were met, the CPD members must submit a time due slip -- as they would for other overtime work performed -- in order to receive compensation for the off-duty BlackBerry work.

There was no trial testimony or other evidence offered to explain the reason for this revision. There also was no evidence explaining how this revised general order was disseminated to members of BOC. We did receive evidence that on October 30, 2013, Chief Roti issued a memorandum to the deputy chief and commanders in BOC stating that the 2013 General Order applied to members of the BOC who were issued BlackBerrys. The memorandum stated that:

> All non-supervisory members of the Bureau of Organized Crime are reminded they are not required to reply to non-emergency, work related phone calls, e-mails or text messages while they are off-duty unless they are receiving compensation. Upon receiving notification of an emergency situation which necessitates the member acting in their official capacity, and being compensated, the member will reply to phone calls, e-mails and text messages until they have been released from the assignment. . . . Supervisory members, and other BOC members issued BOC communications devices, are further reminded they are to comply with the policies set forth in the 'Policy' section of General Order G09-01-05, III.

(JX6). Chief Roti did not distribute this memorandum to lieutenants, sergeants or patrol officers, and, at trial, no plaintiff was shown the memorandum or asked about it. General Orders are available for officers to review, but as with the 2010 General Order, the testimony of the plaintiffs did not reflect a close familiarity with the 2013 General Order.

In any event, as with the 2010 General Order, the issuance of the 2013 General Order had no impact on plaintiffs' performance of off-duty work on their BlackBerrys. Plaintiffs continued to perform off-duty BlackBerry work when they were not on a call-back assignment, and they often did so without pre-approval from their superiors. Sgts. Karuntzos, Padar, Schachelmayer, Stec and Williams and other plaintiffs testified that seeking pre-approval was often not practical

or possible. For example, if an officer was contacted by a CI, that officer could not wait to respond to the CI until he or she was able to contact a supervisor for approval. Likewise, plaintiffs' practices regarding submitting -- or not submitting -- time due slips for off-duty BlackBerry work did not change with the issuance of the 2013 General Order. The evidence did not establish that a time due slip for work done on a BlackBerry would be rejected if there was an absence of pre-approval.

**3.**

We close our discussion of the 2010 and 2013 General Orders with a few final observations. *First*, neither of these general orders existed at the time Sgt. Allen commenced this lawsuit in May 2010. Thus, the general orders could not have created an unwritten policy not to compensate BOC members for off-duty work done using their BlackBerrys, which Sgt. Allen first alleged in his initial complaint.

*Second*, for the reasons we have set forth above, we find that plaintiffs have failed to prove that these general orders emphasized, or reaffirmed, an alleged unwritten policy. As we have already pointed out, neither side elicited any meaningful evidence about what CPD sought to accomplish by issuing these general orders, other than what appears on the face of the orders themselves. To the extent that these general orders were intended to convince members of BOC that they did not need to respond to BlackBerry emails or phone calls while off duty, the testimony established that the orders were an abject failure. The testifying plaintiffs uniformly said that despite what the orders said, they felt obligated to be responsive to BlackBerry communications they received while off duty. We find that testimony credible.

To the extent that the general orders were intended to ensure that members of BOC received supervisory approval before using their BlackBerrys for off-duty work, and that they

not receive compensation for off-duty work without that prior approval, the orders failed on this score as well. There were members of BOC who used their BlackBerrys to perform off-duty work, submitted time due slips for that work, and received payment for that work, all without pre-approval. In short, these general orders did not affect the conduct of the members of BOC, which perhaps is not surprising inasmuch as the language of the general orders describes them as "guidelines," and the evidence shows that neither plaintiffs nor others in CPD treated them as binding.

*Third*, we have considered the possibility that CPD intended the general orders as a means of conveying to BOC members the point that, in this rapidly evolving age of technology, off-duty work using BlackBerrys should be reserved for the occasions that truly warrant it: in other words, not for off-duty matters that are trivial or that could await an officer's arrival at work when next on duty. That would be a legitimate reason to issue the orders: to provide better clarity about how officers should (or should not) use the BlackBerrys while off duty. If that was the goal, the evidence shows that the general orders were a poorly crafted means of achieving it.

As we expressed during closing argument, we wonder about each side's failure to take basic steps that would have eliminated any ambiguity about CPD's approach to compensating off-duty work performed using BlackBerrys. CPD could have cut through the verbiage of the general orders by making a simple written statement that it distributed to every member of the BOC: "if you perform off-duty work on the BlackBerry that is necessary to your job, submit a time slip for it and it will be approved." For their part, plaintiffs could have obtained clarity by submitting time due slips which clearly stated that they were being submitted for off-duty work performed on the BlackBerrys, and thus put to a meaningful test their assertion that CPD

would not compensate them for the work -- and the City's assertion that the time would be paid.[10]

We consider it unfortunate that this ambiguity, or confusion, was allowed to linger. But, the existence of ambiguity or confusion does not constitute a policy forbidding submission of time due slips for off-duty BlackBerry work. The evidence we have already discussed persuades the Court that plaintiffs have failed to prove the unwritten policy that they have alleged.

## C.

We now turn to plaintiffs' contention that their supervisors discouraged them from submitting time due slips for off-duty BlackBerry work, and that plaintiffs believed their positions in BOC would be jeopardized if they sought overtime compensation for this work. Plaintiffs presented only two examples of a supervisor ever discouraging his or her subordinates from turning in time due slips. *First*, Lt. Dedore testified that he often sent emails to his subordinates to manage their overtime more efficiently, including seeking to limit the number of officers who stayed late on a single arrest and restricting overtime for work that was pre-planned and could have been done on a scheduled workday. In one of these emails, Lt. Dedore wrote that "pigs get fat. hogs get slaughtered." *Second*, Lt. Kilroy testified that Cmdr. O'Grady once ridiculed him for turning in a time due slip for as little as one hour of overtime worked.

These two examples fail to establish that supervisors in BOC pressured their subordinates not to put in for off-duty work -- whether or not performed on a BlackBerry. Neither example addressed work performed off duty using a BlackBerry. Nor is there any evidence that these

---

[10]During closing argument, plaintiffs' counsel asserted that the plaintiffs did not submit time due slips for off-duty BlackBerry work they performed because they were "scared" of retaliation (Tr. at 1256). As we stated then, that explanation is not persuasive. Each of these plaintiffs decided to opt into this case by mid-2013, which means by that time they had joined in a lawsuit against the City. We find it difficult to accept that for two years since then, these same officers who had the backbone to sue the City were so fearful of retribution that they could not submit time due slips seeking compensation for off-duty BlackBerry work they performed.

examples became common knowledge among members of BOC. Given that fourteen plaintiffs testified, we also would have expected more examples to be offered if supervisors were engaged in a pattern of discouraging the submission of time due slips for off-duty work done using a BlackBerry. To the contrary, the evidence showed that plaintiffs were never told that they would not be compensated for off-duty work performed on their BlackBerrys, or instructed not to submit time due slips for this work.

Plaintiffs emphasize that they were not directed by their superiors to submit time due slips for off-duty BlackBerry work. However, the evidence shows that this was not universally the case. Sgt. Fiduccia testified that recently, in the spring or summer of 2015, his commander instructed him to submit a time due slip for about two hours of work he performed on his BlackBerry while off duty. In addition, Lts. Hamilton and Konow testified that they encouraged their subordinates to submit slips for this work. More importantly, the CPD overtime procedure did not require supervisors to direct their subordinates to submit a slip before they did so, and there is no evidence that BOC supervisors routinely directed their subordinates to put in time due slips for non-BlackBerry work but failed to do so for BlackBerry work. Plaintiffs routinely submitted time due slips for other types of off-duty work without first being told to do so by a supervisor.

A few of the plaintiffs also testified that they believed their assignments in BOC would be jeopardized if they submitted slips for off-duty BlackBerry work. For example, Off. Mancini and Sgts. Karuntzos, Spencer and Stec testified that they believed there would be repercussions if they turned in slips for off-duty work they performed on their BlackBerrys. However, these plaintiffs had never heard of anyone submitting a slip for off-duty BlackBerry work, or being reprimanded or otherwise disciplined for doing so. Plaintiffs presented no evidence that anyone

who submitted time due slips for off-duty BlackBerry work was ever reprimanded, disciplined or removed from BOC.[11] We find that plaintiffs did not establish a well-grounded fear of adverse consequences if they submitted time due slips for off-duty BlackBerry work.

**D.**

Plaintiffs contend that upper-level command in BOC exerted pressure on them to limit all overtime work, and by so doing, discouraged them from submitting time due slips for off-duty work they performed on their BlackBerrys. Several witnesses at trial testified that they recalled a few sporadic discussions over the years regarding a desire to limit overtime in BOC. Cmdr. Gorman recalled a push to reduce overtime between 2008 and 2010, and Cmdr. Ryan testified that he sent an email to his subordinates in May 2013 stating that there was room to decrease overtime requests for carrying out search warrants. Sgts. Lohman and Williams also recalled some discussions about excessive use of overtime.

However, no plaintiff testified that any alleged restriction on working overtime was a reason he or she did not submit a time due slip seeking compensation for off-duty work performed on a BlackBerry. Chief Roti testified that although at times there were general directives, or requests, to shrink the budget and reduce overtime, total overtime in BOC never actually decreased, and no official policies ever were instituted to limit overtime or overtime compensation. The evidence concerning the amount of overtime that plaintiffs worked tends to support Chief Roti's testimony.

Defendant provided data of the recorded overtime each plaintiff worked while in the BOC during the period 2011 through 2014 (DX1). The data set forth: (1) the number of 28-day

---

[11]Though Sgt. Allen was removed from BOC, he had never submitted a slip for off-duty work he performed on his BlackBerry, and the grievance he filed after his removal did not mention any overtime payment issue.

25

periods in which each plaintiff recorded time worked in excess of 171 hours,[12] and (2) the total

number of overtime hours each plaintiff worked during each of those four years. We have

aggregated this data for all plaintiffs, collectively, in the chart below:[13]

| Year | Number of 28-day work periods in which plaintiffs worked greater than 171 hours | Total number of overtime hours plaintiffs worked greater than 171 hours |
|---|---|---|
| 2011 | 155 | 2,922 |
| 2012 | 170 | 3,539 |
| 2013 | 171 | 3,810 |
| 2014 | 149 | 3,540.75 |

The data shows that the total number of overtime hours for which plaintiffs were compensated

actually increased by 618.75 hours, or approximately 21.2 percent, from 2011 to 2014. Overtime

hours increased by 617 hours from 2011 to 2012 alone, and by another 271 hours in 2013.

What's more, the apparent decrease in the number of overtime hours from 2013 to 2014 likely

does not represent an actual decrease in overtime hours worked by each plaintiff, because several

of the plaintiffs retired or transferred out of BOC before or during 2014.[14] This large overall

---

[12]There are thirteen 28-day pay periods per calendar year.

[13]DX1 included additional data which we do not include here: (1) the last 28-day period in 2010; and (2) data for Sgt. Laurich, who is no longer a plaintiff in the case. Including this additional data would not alter the results of the analysis we offer.

[14]DX1 collects only hours worked by plaintiffs while they were assigned to BOC. Of the fifty-one plaintiffs, DX1 shows the following plaintiffs did not work in BOC through all or part of 2014: (1) P.O. Mancini was on paid medical leave from approximately March 2014 until his retirement on December 15, 2014; (2) Sgt. Timothy Casey transferred out of BOC on August 17, 2014; (3) Lt. Hamilton retired on November 2, 2013; (4) Sgt. Karen Skipper transferred out of BOC on May 1, 2014; (5) Sgt. Betz transferred out of BOC on February 8, 2014; (6) Sgt. Tony DiCristofano transferred out of BOC on April 27, 2014; (7) Sgt. Steven Dziak transferred out of BOC on June 22, 2014; (8) Sgt. Patrick Gillespie transferred out of BOC on May 1, 2014; (9) Sgt. Padar transferred out of BOC on April 10, 2014; (9) Sgt. Melvin Roman transferred out of BOC on February 9, 2014; (10) Sgt. Stec transferred out of BOC on October 11, 2014; (11) Sgt. Yolanda Talley transferred out of BOC on December 7, 2014. In addition, a few of the plaintiffs retired or transferred out of BOC before 2013: (1) P.O. David Dombkowski retired on September 15, 2012; (2) Sgt. Kenneth Epich retired on December 23, 2011; (3) Sgt. Mark Golosinski transferred out of BOC on September 14, 2011; (4) Sgt. Allen transferred out of BOC on February 3, 2010; (5) Lt. Cervenka retired on December 16, 2011; (6) Sgt. Flores retired on November 15, 2011; (7) Sgt. Mark Higgs transferred out of BOC on July 22, 2011; (8) Sgt. Rodney Hill did not perform any work for BOC during the time period; (9) Sgt. Michelle Rubino transferred out of BOC on July 21, 2012; (10) Lt. Osvaldo Valdez transferred out of BOC on April 11, 2012; (11) Sgt. Washburn retired on August 3, 2012.

increase in overtime during the class period does not square with plaintiffs' contention that BOC pushed to limit the amount of overtime compensation it paid.[15]

Given the mission of BOC, and the public pressure on police to effectively address violent crime, it is not surprising that the amount of overtime work would increase (and not decrease) between 2011 and 2014. In addition, the evidence shows another reason why CPD would not have been motivated to push to limit all overtime work in BOC. For BOC officers who worked on federal task forces (including testifying plaintiffs Sgts. Allen, Inzerra, Karutnzos and Williams), the federal government reimbursed CPD for a substantial amount of overtime hours these personnel worked as part of the joint federal task force teams. We find that plaintiffs have failed to prove that CPD engaged in any concerted effort to reduce the amount of overtime worked in BOC.

## CONCLUSIONS OF LAW

We now consider whether, in light of this Court's findings of fact, plaintiffs have met their burden of proving, by a preponderance of the evidence, that they performed off-duty work on their BlackBerrys, and that the CPD had an unwritten policy to deny plaintiffs compensation for that work.

### I.

The first question we address is whether the off-duty activities plaintiffs performed on their BlackBerrys constituted compensable "work" under the FLSA, *i.e.*, whether the activities were pursued necessarily and primarily as part of their jobs within BOC. *Alvarez*, 546 U.S. at 25,

---

[15]Plaintiffs have asserted that the City's records concerning overtime are incomplete (doc. # 218: Pl.'s Rev. Proposed Findings ¶ 18). We do not make any finding on this assertion, which is unnecessary to our decision. But, we do note that if by this assertion plaintiffs mean they actually worked more hours than the amounts set forth in DX1, that would only reinforce our conclusion that the evidence failed to show any push by CPD to reduce or limit the amount of overtime worked in BOC.

37. We conclude that some, but not all, of the off-duty activities plaintiffs performed on their BlackBerrys constituted compensable work under the FLSA.

The Department-issued BlackBerrys give the plaintiffs the ability to perform certain necessary work while on and off duty. Some activities plaintiffs performed on their BlackBerrys had to be done immediately, even if they were off duty. These activities include reaching out to CIs, gathering information on investigations that were heating up, and contacting and reallocating teams of officers in response to a shooting. Such off-duty activities were at times pursued necessarily and primarily as part of plaintiffs' jobs in BOC, and constituted compensable work under the FLSA. *See Busk*, 135 S.Ct. at 519; *Alvarez*, 546 U.S. at 25.

However, the evidence failed to show that all of the off-duty activities plaintiffs performed on their BlackBerrys were a necessary part of their jobs. For example, the mere act of plaintiffs "monitoring" their BlackBerrys does not constitute an activity pursued necessarily and primarily for the benefit of the City under the FLSA, so long as the plaintiffs could still spend their off-duty time "primarily for [their] own benefit without persistent interruptions." *Brand v. Comcast Corp.*, No. 12-1122, 2015 WL 5693659, at *17 (N.D. Ill. Sept. 28, 2015). *See also Ruffin v. MotorCity Casino*, 775 F.3d 807, 812-13 (6th Cir. 2015) (collecting cases finding that requirement that an employee carry a radio and respond if necessary does not convert a meal period to compensable time under the FLSA, unless monitoring the radio prevented the employee from using those break periods predominantly for the employee's own benefit).[16]

---

[16]"The gist of these cases is that monitoring a radio, and being available to respond if called, is a *de minimis* activity, not a substantial job duty." *Ruffin*, 775 F.3d at 812. In its answer to plaintiffs' amended complaint, defendant asserted that any work plaintiffs performed on their BlackBerrys was *de minimis*, and therefore non-compensable (doc. # 120: Am. Answer to Aff. Defenses at 11). The issue of what constitutes *de minimis* work under the FLSA is not well-defined in the Seventh Circuit. *Compare Kellar*, 664 F.3d at 176-77 (finding that the amount of overtime work at issue, "both per day and in the aggregate," was substantial at between 10 and 40 minutes each day) *with Mitchell v. JCG Indus., Inc.,* 745 F.3d 837, 845 (7th Cir. 2014) (holding that a few minutes spent each day donning and doffing during mealtime was *de minimis). But see Mitchell,* 745 F.3d at 851 (Wood, J., dissent) (disagreeing with the majority's decision to analyze "each day, or part of a day, separately" -- instead of aggregating

Although the dividing line between work that is *de minimis* and that which is substantial may be murky in some instances, the evidence showed that at least some of plaintiffs' off-duty activities using BlackBerrys qualify as work. We conclude that plaintiffs have met their burden of proving that they performed off-duty work using their BlackBerrys.

## II.

In addition to proving that they performed off-duty work using their BlackBerrys, to succeed on their claims plaintiffs also must show that they were "not properly compensated" for this off-duty work. *Kellar*, 664 F.3d at 173. In this case, where the City maintains an established process for seeking and receiving overtime compensation, that requires plaintiffs to prove two things: (1) that the CPD maintained an unwritten policy to deny compensation for off-duty work performed using a BlackBerry, and (2) that including time worked off duty on their BlackBerrys, plaintiffs would have worked more than 171 hours during one or more 28-day periods, entitling them to overtime payments they did not receive. We bifurcated this case for trial because the question of whether plaintiffs were "not properly compensated" thus depends on the ability of plaintiffs to prove, at the threshold, the alleged unwritten policy to deny them compensation for off-duty BlackBerry work. We conclude that plaintiffs have not proven that the City maintained an unwritten policy to deprive plaintiffs of payment for off-duty work performed on their BlackBerrys.[17]

---

the amount of time spent each work-week -- to find that the amounts of time the employees spent donning and doffing clothes fell below the *de minimis* threshold, because *Sandifer v. United States Steel Corporation*, 134 S.Ct. 870, 880 (2014), asked whether the period at issue can "on the whole, be fairly characterized as time spent in changing clothes or washing").

[17]Because the trial focused on the question of whether the CPD maintained the alleged unwritten policy, we did not ask the parties to present evidence regarding specific amounts of time they spent doing off-duty work on their BlackBerrys. We therefore need not, and do not, make any finding as to whether any plaintiff in fact would have more than 171 compensable hours of work during any given 28-day period if one were to include off-duty BlackBerry time that was not submitted on a time due slip but that would qualify as "work."

**A.**

The Sixth Circuit has held that "[u]nder the FLSA, if an employer establishes a reasonable process for an employee to report uncompensated work time, the employer is not liable for non-payment if the employee fails to follow the established process." *White v. Baptist Mem. Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012); *see also Jones-Turner v. Yellow Enterprise Sys., LLC*, 597 F. App'x 293, 298 (6th Cir. 2015) (holding that where the employer did not have knowledge of an employee's overtime work because the employee did not report his or her overtime work according to the reasonable process established, the employer was not liable for non-payment of the unreported time). While the Seventh Circuit has not directly held that the failure to follow established overtime procedures extinguishes an FLSA claim, in *Gaines v. K-Five Const. Corp.*, 742 F.3d 256, 271 (7th Cir. 2014), the Seventh Circuit upheld a district court's decision to grant summary judgment to the employer on an FLSA overtime claim where the employee's failure to follow the employer's clear overtime procedures may have precluded the employer from learning of the employee's overtime work. In *Gaines*, the employee failed to record the overtime he allegedly worked in his "daily driver reports," which "very clearly and prominently" sought information about the hours the employee worked each day. *Id.*

Nevertheless, a lawful, written policy to pay overtime for off-duty work will not shield an employer from liability if plaintiffs can show that the employer in fact followed an unwritten practice or policy that violated the FLSA. *Allen*, 2014 WL 5461856, at \*5. *See also Russell v. Ill. Bell Tel. Co., Inc.*, 721 F. Supp. 2d 804, 815-16 (N.D. Ill. 2010); *Brand v. Comcast Corp.*, No. 12-1122, 2012 WL 4482124, at \*5 (N.D. Ill. Sept. 26, 2012); *see also Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 374-75 (7th Cir. 2015) (upholding the district court's decision to grant class certification on the common question of whether the defendant had an unofficial policy or

practice that required employees class-wide to work off-the-clock overtime hours). Plaintiffs contend that the City's established process for seeking overtime compensation did not apply to off-duty work they performed on their BlackBerrys. Instead, plaintiffs argue that the City had an unwritten -- and unlawful -- policy not to pay for this work. Defendant, by contrast, contends that off-duty work performed on CPD-issued BlackBerrys, like all other off-duty work, would be compensated if plaintiffs followed CPD's established procedures. Thus, the City contends that plaintiffs' failure to follow the established procedures precludes their FLSA claims.

**B.**

As we explained above, some plaintiffs testified that they believed they could not turn in time due slips for off-duty BlackBerry work because there was a pervasive culture or understanding within BOC that this work would not be compensated. However, the evidence at trial failed to bear out the culture these witnesses alleged.

The evidence established that several plaintiffs submitted time due slips for off-duty work performed on their BlackBerrys, and they were never denied compensation for this work. The evidence also showed that at least two supervisors -- Lts. Hamilton and Konow -- approved time due slips for off-duty work they knew was performed on BlackBerrys. No plaintiff was ever told that he or she should not submit time due slips for off-duty BlackBerry work. As explained above, this is strong evidence against a shared understanding or policy that BOC members should perform this work without pay.

Plaintiffs argued in closing that they showed that the City nevertheless "suffer[ed] or permit[ted]" or "knew or had reason to believe" that other plaintiffs were continuing to perform

off-duty BlackBerry work without compensation, in violation of the FLSA (Tr. 1248).[18] In *Kellar*, the Seventh Circuit held that the FLSA's definition of "employ" as including "to suffer or permit to work" means that "the FLSA stops short of requiring the employer to pay for work it did not know about, and had no reason to know about;" *i.e.*, overtime work of which the employer did not have "actual or constructive knowledge" that its employee performed. *Kellar*, 664 F.3d at 177.

At trial, plaintiffs testified that it was well-known within BOC that members performed off-duty work on their BlackBerrys. They also testified that on some specific occasions, a supervisor may have known a plaintiff was performing off-duty BlackBerry work when the supervisor contacted the plaintiff on his or her BlackBerry. However, the evidence did not show a common understanding or knowledge within BOC that off-duty BlackBerry work was not compensated.

A showing of knowledge under the FLSA must go beyond speculation that an employee's performance of unpaid overtime work was "theoretically possible." *Roberts v. Advocate Health Care*, No. 14-442, 2015 WL 4719897, at *8 (N.D. Ill. Aug. 7, 2015). A plaintiff must show "*which* [employees] were working [off-the-clock], how frequently they were doing it, and why it was occurring." *Blakes v. Ill. Bell Tel. Co.*, 75 F. Supp. 3d 792, 810 (N.D. Ill. 2014) (citing *Boelk v. AT & T Teleholdings, Inc.*, No. 12-40, 2013 WL 3777251, at *10 (W.D. Wis. July 19, 2013)) (emphasis in original). It is not enough that managers knew or should have known that "unidentified" employees were performing off-the-clock work without being paid. *Id.*

---

[18]It is well-settled, and the parties do not dispute, that knowledge of a supervisor within BOC would be imputed to their employer, the City. *See, e.g., Skelton v. Am. Intercontinental Univ. Online*, 382 F. Supp. 2d 1068, 1074 (N.D. Ill. 2005).

Plaintiffs have not shown that their supervisors invariably knew or should have known when they were working off duty on their BlackBerrys. *First*, much of plaintiffs' off-duty BlackBerry work occurred outside the physical presence of their supervisors, and the testimony at trial persuades us that supervisors were often unaware whether a subordinate was on or off duty. *Second*, much of plaintiffs' alleged off-duty work on their BlackBerrys was performed with individuals other than their direct supervisors. Plaintiffs' supervisors would not be aware in these instances when, why or with whom plaintiffs were communicating on their BlackBerrys while off duty.

Plaintiffs also have failed to prove that the City knew or had reason to know that they were not receiving compensation for any particular overtime a plaintiff may have worked. *First*, supervisors within BOC did not know whether their subordinates turned in time due slips to receive compensation for off-duty BlackBerry work, both because the time due slips generally do not state how overtime work was completed, and because they reviewed so many time due slips (up to 120) each day, sometimes well after the work was performed. *See Roberts*, 2015 WL 4719897, at \*8 (holding that it was speculative to assume that the supervisor was able to detect that the plaintiff's time cards were short certain overtime hours). Even if the supervisor knew a plaintiff had performed off-duty work on his or her BlackBerry, it would be extremely impractical to verify that a time due slip was turned in for that work. *See Hertz v. Woodbury Cnty., Iowa*, 566 F.3d 775, 781-82 (8th Cir. 2009) ("access to records indicating that employees were working overtime . . . is not necessarily sufficient to establish constructive knowledge").

*Second*, while the evidence showed that plaintiffs were rarely specifically instructed to submit overtime slips for off-duty BlackBerry work, there is no legal requirement that an employer advise its employees to request payment each time overtime is worked when the

employer maintains a legal overtime payment policy. And, there is no evidence plaintiffs were routinely instructed to submit requests for overtime work that did not involve off-duty BlackBerry use.

*Third*, plaintiffs never raised any concern or complaint to any supervisor or union representative that they were not being paid for time they worked on their BlackBerry while off duty. "By failing to record their hours accurately and failing to tell their supervisors or managers about [the unpaid, off-duty work], plaintiffs prevented defendants from having actual knowledge of their off the clock work." *Kellar*, 664 F.3d at 178. Plaintiffs have not shown that complaining to their supervisors about not being paid for their off-duty work would have been futile, or that the City prevented them from accurately reporting their off-duty BlackBerry work. *Compare Blakes*, 77 F. Supp. 3d at 783-84. As in *Roberts*, the uncontroverted evidence shows that plaintiffs' employer (with minimal exceptions) paid them for almost all the overtime they sought when they filled out time due slips, including for off-duty BlackBerry work. *Roberts*, 2015 WL 4719897, at *9. Nothing prevented plaintiffs from submitting time due slips for off-duty BlackBerry work. We agree with the district court judge in *Roberts* that a plaintiff's "subjective belief that a further complaint about not being paid . . . would fall on deaf ears has no bearing on whether [the plaintiff] could have complained about the alleged unpaid overtime at issue in th[e] case." *Id.*

Thus, we conclude that plaintiffs fell far short of showing a uniform culture or well-grounded understanding that off-duty BlackBerry work would not be compensated in BOC. Plaintiffs have not proven that supervisors within BOC had specific knowledge of off-duty BlackBerry work being performed without compensation (*i.e.*, without a corresponding time due slip being turned in). And, in light of the evidence that BOC members (including plaintiffs)

turned in slips for off-duty BlackBerry work and were compensated, plaintiffs have not shown that there was a common understanding (or an unwritten policy) that such work would not be compensated.

**C.**

We also conclude that the general orders and compliance statements did not create or institutionalize an unwritten policy of not compensating plaintiffs for off-duty BlackBerry work. The facts showed that the general orders had no effect on plaintiffs' practices with regard to working off duty on their BlackBerrys and submitting, or not submitting, time due slips for this work.

*First*, despite language in the 2010 General Order stating that members would not be paid for performing off-duty BlackBerry work unless on a call-back assignment or specifically directed and authorized by a supervisor to perform the overtime work, plaintiffs continued to regularly perform off-duty BlackBerry work that was not pre-approved or on a call-back assignment. In addition, plaintiffs' practices with regard to submitting or not submitting time due slips for this work did not change with the issuance of the 2010 General Order.

*Second*, despite language in the 2013 General Order stating that plaintiffs *will not* use their BlackBerry to perform off-duty work unless on a call-back assignment or specifically directed and authorized by a supervisor to perform the overtime work, plaintiffs continued to perform off-duty work on their BlackBerrys without pre-approval from their supervisors. Plaintiffs' practices regarding submitting or not submitting time due slips did not change with the issuance of the 2013 General Order.

*Third*, the 2010 and 2013 General Orders themselves state that they are only "guidelines," and plaintiffs treated them as such. *See Thompson v. City of Chicago*, 472 F.3d

444, 454 (7th Cir. 2006) (noting that CPD's general orders regarding the use of force were "intended merely to 'provide members guidance on the reasonableness of a particular response option,' when taking a suspect into custody"). Plaintiffs did not follow the general orders if it was not practicable for them to do so.

We conclude that the General Orders did not reaffirm an unwritten policy to deny payment for off-duty work performed on BlackBerrys, and did not create such a policy.

## D.

Plaintiffs also failed to show that they had a reasonable basis to believe that their positions within BOC would be jeopardized if they sought overtime compensation for off-duty BlackBerry work. Plaintiffs were never told they would not be compensated for off-duty work performed on their BlackBerrys or instructed not to submit a time due slip for this work. Those who submitted time due slips for off-duty BlackBerry work were never reprimanded, disciplined or removed from BOC, even though some supervisors (Lts. Konow and Ryan) said they were aware these slips were being submitted and approved them. Moreover, once these plaintiffs joined this lawsuit alleging that they were not compensated for off-duty BlackBerry work -- and faced no repercussions at work for doing so -- plaintiffs cannot convincingly argue that they still had reason to fear repercussions for submitting a slip seeking compensation for this work.

## E.

We also find that the City did not push to limit all overtime in BOC, including for off-duty BlackBerry work. *First*, as the findings above demonstrate, any plans by the City to limit overtime were sporadic and never enforced within BOC. To the contrary, the amount of overtime worked within BOC increased, rather than decreased, during the relevant time period. *Second*, plaintiffs were not discouraged from submitting time due slips for off-duty BlackBerry work due

to any sporadic push to limit overtime. No plaintiff testified that any alleged restriction on overtime was a reason they did not submit a time due slip to seek compensation for work they performed off duty on their BlackBerrys. Plaintiffs did not show that any purported push to limit overtime within BOC supported their contention that the City maintained an unwritten policy not to compensate for off-duty BlackBerry work.

In sum, plaintiffs have not proven by a preponderance of the evidence that the City maintained an unwritten policy to deny them compensation for off-duty work they performed on their CPD-issued BlackBerrys.

## CONCLUSION

While plaintiffs have shown that they performed off-duty work on their BlackBerrys, they have not met their burden of showing that they were not compensated pursuant to any unlawful policy by the City or that the City suffered or permitted this work to be done without compensation. Because plaintiffs have failed to make the necessary showing on this threshold issue, plaintiffs have failed to prove their claim that the City violated the Fair Labor Standards Act. We therefore rule in favor of the City and against plaintiffs, all of whom are bound by this judgment as members of this FLSA collective action into which they have opted. *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 771-72 (7th Cir. 2013) (citing 29 U.S.C. § 216(b)).

Our ruling today only resolves the plaintiffs' claims for payment of overtime in this specific lawsuit. Even had we found for plaintiffs, this Court would lack the authority to dictate the procedures that the City should adopt to deal with off-duty use of the BlackBerrys. *See Heitmann v. City of Chicago, Ill.*, 560 F.3d 642, 644 (7th Cir. 2009) (under the FLSA, injunctive relief is permissible only in suits by the Secretary of Labor; otherwise, changes in the City's

practices must be achieved through collective bargaining). That said, we hope our ruling today provides helpful guidance to the parties. The march of technology has been steadily (indeed, rapidly) moving forward. We expect that this march forward will continue, and that our use of and reliance on devices that allow work to be performed remotely will not abate. We thus expect that members of BOC will continue to use their BlackBerrys or like devices while off duty, because of the important work that can be accomplished with them. It is up to the parties to work cooperatively to prevent future litigation concerning compensation for the off-duty use of Department-issued BlackBerrys.

We enter judgment in favor of the City and against defendants. This case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: December 10, 2015**